UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

RASHANDA MCCANTS and DEVON
RAMSAY, individually and on behalf of all
others similarly situated,

        Plaintiffs,

    v.

THE NATIONAL COLLEGIATE
ATHLETIC ASSOCIATION and THE
UNIVERSITY OF NORTH CAROLINA AT
CHAPEL HILL,

        Defendants.

Case No.  1:15-CV-176

**MEMORANDUM IN SUPPORT OF
DEFENDANT THE NATIONAL
COLLEGIATE ATHLETIC
ASSOCIATION'S
MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ............................................................................................. 1

II. BACKGROUND ............................................................................................ 2

    A.    Alleged Academic Fraud At UNC ............................................... 2

    B.    Plaintiffs' Theory Of Liability And Allegations Against The NCAA .......... 4

    C.    Plaintiffs' Claims Against The NCAA .......................................... 8

III. QUESTIONS PRESENTED .......................................................................... 10

IV. ARGUMENT ............................................................................................... 10

    A.    The NCAA Did Not Owe Plaintiffs A Duty To Prevent Academic Fraud At UNC ............................................................................ 11

        1.    The NCAA Did Not Owe Plaintiffs A Duty Under Traditional Negligence Standards ...................................................... 11

        2.    The NCAA Did Not Owe Plaintiffs A Fiduciary Duty ................... 17

    B.    Plaintiffs' Request For Injunctive Relief Should Be Dismissed ................ 20

        1.    Plaintiffs Do Not Have Standing To Pursue Injunctive Relief ........ 20

        2.    The Injunctive Relief Plaintiffs Seek Is Overbroad ......................... 22

    C.    Plaintiffs' Claims Against The NCAA Are Time-Barred ............................ 24

        1.    Negligence ........................................................................ 24

        2.    Breach Of Fiduciary Duty .................................................... 29

CONCLUSION ................................................................................................ 30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbitt v. Gregory*,
160 S.E.2d 896 (N.C. 1931) ......................................................................... 17

*Adcock v. Freightliner LLC*,
550 F.3d 369 (4th Cir. 2008) ...................................................................... 11

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................................................... 10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...................................................................................... 10

*Blum v. Yaretsky*,
457 U.S. 991 (1982)...................................................................................... 22

*Cent. Wesleyan Coll. v. W.R. Grace & Co.*,
6 F.3d 177 (4th Cir. 1993) ........................................................................... 22

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983).................................................................................. 20, 21

*Cole v. Oroville Union High Sch.*,
228 F.3d 1092 (9th Cir. 2000) .................................................................... 21

*Crumley & Assocs., P.C. v. Charles Peed & Assocs., P.A.*,
730 S.E.2d 763 (N.C. App. 2012)................................................................ 18

*Cureton v. NCAA*,
198 F.3d 107 (3d Cir. 1999) ....................................................................... 11

*Dallaire v. Bank of Am., N.A.*,
760 S.E.2d 263 (N.C. 2014) ....................................................................... 17

*Dalton v. Camp*,
548 S.E.2d 704 (N.C. 2001) ....................................................................... 17

*Davidson v. Univ. of N.C. at Chapel Hill*,
543 S.E.2d 920 (N.C. Ct. App. 2001).................................................... 12, 15

*Dawn v. Dawn*,
470 S.E.2d 341 (N.C. Ct. App. 1996).......................................................... 30

ii

Page(s)

*Doe v. U.S. Dep't of Health & Human Servs.*,
   No. CV 14-367, 2015 WL 1316290 (D.D.C. Mar. 24, 2015) ...................................... 24

*E.E.O.C. v. Bloomberg L.P.*,
   778 F. Supp. 2d 458 (S.D.N.Y. 2011) .......................................................................... 24

*Evans v. B.F. Perkins Co.*,
   166 F.3d 642 (4th Cir. 1999) ...................................................................................... 11

*Foster v. National Christian Counselors Association, Inc.*,
   No. 1:03CV00296, 2004 WL 1497562
   (M.D.N.C. June 1, 2004) .......................................................... 12, 13, 14, 15

*Friedland v. Gales*,
   509 S.E.2d 793 (N.C. Ct. App. 1998).......................................................................... 25

*Friends of the Earth, Inc. v. Laidlaw Env. Servs.*,
   528 U.S. 167 (2000).................................................................................................... 20

*Fussell v. NC Farm Bureau*,
   680 S.E.2d 229 (N.C. Ct. App. 2009).......................................................................... 15

*Grandson v. Univ. of Minn.*,
   272 F.3d 568 (8th Cir. 2001) ...................................................................................... 21

*Hairston v. Pac-10 Conf.*,
   101 F.3d 1315 (9th Cir. 1996) .............................................................................. 16, 17

*Hairston v. Pac-10 Conf.*,
   893 F. Supp. 1485 (W.D. Wash. 1994) ...................................................................... 16

*Hall v. NCAA*,
   985 F. Supp. 782 (N.D. Ill. 1997) ............................................................................... 17

*Hall v. Toreros, II, Inc.*,
   626 S.E.2d 861 (N.C. Ct. App. 2006).......................................................................... 14

*Hendrick v. Rains*,
   466 S.E.2d 281 (N.C. Ct. App. 1996).......................................................................... 15

*Hendricks v. Clemson Univ.*,
   578 S.E.2d 711 (S.C. 2003) ........................................................................................ 18

*Hetzel v. JPMorgan Chase Bank, N.A.*,
   No. 4:13-CV-236, 2014 WL 7336863 (E.D.N.C. Dec. 22, 2014).................................. 24

iii

## TABLE OF AUTHORITIES
### (Continued)

*Kentuckians for Commonwealth Inc. v. Rivenburgh*,
  317 F.3d 425 (4th Cir. 2003) ........................................................................ 23

*Knelman v. Middlebury College*,
  898 F. Supp. 2d 697 (D. Vt. 2012) ......................................................... 16, 18

*Lowery v. Circuit City Stores, Inc.*,
  158 F.3d 742 (4th Cir. 1998) ........................................................................ 22

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ..................................................................................... 20

*McFadyen v. Duke Univ.*,
  786 F. Supp. 2d 887 (M.D.N.C. 2011) ........................................................ 18

*Morgan v. Nash County*,
  735 S.E.2d 615 (N.C. Ct. App. 2012) .......................................................... 20

*Mynhardt v. Elon University*,
  725 S.E.2d 632 (N.C. Ct. App. 2012) ..................................................... 14, 15

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
  591 F.3d 250 (4th Cir. 2009) .................................................................. 10, 11

*Neuse River Found., Inc. v. Smithfield Foods, Inc.*,
  574 S.E.2d 48 (N.C. Ct. App. 2002) ............................................................ 20

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) ..................................................................................... 21

*PBM Prods., LLC v. Mead Johnson & Co.*,
  639 F.3d 111 (4th Cir. 2011) .................................................................. 22, 23

*Pearson v. Gardner Wynne Sewell LLP*,
  814 F. Supp. 2d 592 (M.D.N.C. 2011) ........................................................ 24

*Pederson v. La. State Univ.*,
  213 F.3d 858 (5th Cir. 2000) ....................................................................... 21

*Ryan v. Univ. of N.C. Hosps.*,
  No. COA04-16, 2005 N.C. App. LEXIS 402 (2005) ................................... 18

*S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*,
  659 S.E.2d 442 (N.C. Ct. App. 2008) .......................................................... 17

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Setzer v. Old Republic Life Ins. Co.*,
126 S.E.2d 135 (N.C. 1962) ................................................................... 26, 27

*Shapiro v. Butterfield*,
921 S.W.2d 649 (Mo. Ct. App. 1996) ........................................................ 18

*Stein v. Asheville City Bd. of Educ.*,
626 S.E.2d 263 (N.C. 2006) ..................................................................... 12

*Stunzi v. Medlin Motors, Inc.*,
714 S.E.2d 770 (N.C. Ct. App. 2011) ........................................................ 29

*Toomer v. Branch Banking & Trust Co.*,
614 S.E.2d 328 (N.C. Ct. App. 2005) ........................................................ 29

*Trillium Ridge Condo. Ass'n v. Trillium Links & Vill., LLC*,
764 S.E.2d 203 (N.C. Ct. App. 2014) ........................................................ 29

*Virginia Society for Human Life, Inc. v. Federal Election Commission*,
263 F.3d 379 (4th Cir. 2001) .................................................................... 23

*Wilkerson v. Christian*,
No. 1:06CV00871, 2008 WL 483445 (M.D.N.C. Feb. 19, 2008) ........................... 25, 29

**Statutes and Rules**

N.C. Gen. Stat. § 1-52(5) ........................................................................ 24

Fed. R. Civ. P. 12(b)(1) ........................................................................... 11, 20

Fed. R. Civ. P. 12(b)(6) ........................................................................... 10, 11, 29

**Other Authorities**

Restatement (Second) of Torts (1965) ....................................................... 15

# I.
## INTRODUCTION

In this putative class action, Plaintiffs bring claims based on allegations of wide-spread academic fraud at the University of North Carolina at Chapel Hill ("UNC"). The type of alleged academic fraud identified in Plaintiffs' complaint is without question a serious concern for all students—student-athletes and non-student-athletes alike. It does not, however, give Plaintiffs a cause of action against the National Collegiate Athletic Association (the "NCAA"). Nor do Plaintiffs' criticisms of the NCAA's rules and policies, or the broader questions Plaintiffs raise about the NCAA's role in intercollegiate athletics, translate to legal liability.

Plaintiffs' claims are subject to dismissal on three distinct grounds. First, both of Plaintiffs' claims against the NCAA depend on the existence of a legal duty owed by the NCAA to Plaintiffs, but Plaintiffs have not alleged any plausible theory on which the NCAA could be held to have had such a duty. Indeed, the theory Plaintiffs advance—that the NCAA was negligent in regulating and monitoring its member institutions and had a duty to do more to protect Plaintiffs—has been squarely rejected by North Carolina courts. That alone is enough to defeat Plaintiffs' claims, which fail as a matter of law.

In addition, Plaintiffs' request for injunctive relief must be dismissed because 1) Plaintiffs do not have standing to seek injunctive relief, and 2) the specific injunctive relief they seek is far broader than the harms they allege in their complaint. And, finally, even if Plaintiffs' allegations were not otherwise facially insufficient to state a claim for

relief, Plaintiffs' claims against the NCAA would be barred by the applicable three-year statutes of limitations.

Accordingly, each of Plaintiffs' claims against the NCAA should be dismissed with prejudice.

## II.
## BACKGROUND

### A.    Alleged Academic Fraud At UNC

Plaintiffs Rashanda McCants and Devon Ramsay are former UNC student-athletes. McCants attended UNC from 2005 to 2009 on a women's basketball scholarship, Complaint ("Compl.") (ECF No. 5) ¶ 9, and Ramsay attended UNC from 2007 to 2012 on a football scholarship, *id.* ¶ 12, but Plaintiffs assert claims for events that transpired at UNC from 1989 to 2011—the putative "Class Period," *see id.* ¶¶ 58, 226. Plaintiffs allege that, during that period, "UNC furnished academically unsound classes that provided deficient educational instruction to thousands of students—chief among them nearly 2,000 college athletes." *Id.* ¶ 145. These deficient courses initially included "dozens of sham 'paper classes,'" which over time "calcified into a 'shadow curriculum' in which no course attendance was required and no faculty were involved." *Id.*

Plaintiffs allege that the problems began in or around 1989, when the Student Services Manager for UNC's African and Afro-American Studies ("AFAM") Department, Deborah Crowder, "conceived of" the sham paper classes at issue. *Id.* ¶ 149. "Unlike traditional independent studies classes at UNC, no faculty member was involved in managing the courses or supervising students' research and writing." *Id.* The

2

students enrolled in these courses "never had a single interaction with a faculty member; their only interaction was with Crowder," an administrator. *Id.* Crowder "provided the students with no actual instruction," *id.* ¶ 150, and, when she graded their work, "she typically awarded As or high Bs—even when she did not read the papers," *id.* ¶ 151.

Crowder "modified her approach" in the late 1990s and "started offering paper classes under the guise of traditional lecture classes as opposed to independent studies." *Id.* ¶ 152. But "[d]espite their lecture designation on the course schedule," these purported "lecture" courses involved "no class attendance or student interaction with anyone other than Crowder, and Crowder continued to grade the papers." *Id.* During this period, Crowder also crafted "shadow" courses—watered-down versions of legitimate courses offered by the AFAM department "that lacked rigor, any lectures, or faculty involvement"—and forged faculty signatures on the grading rolls. *Id.* ¶ 153.

Neither McCants nor Ramsay allege that they were enrolled in "sham" or "shadow" courses from 2009 forward, *see id.* ¶¶ 10, 13, but they assert that after Crowder retired in 2009, counselors from UNC's Academic Support Program for Student-Athletes lobbied Julius Nyang'oro, Chair of the AFAM Department, to offer paper classes like those Crowder had devised, *id.* ¶¶ 168-69. He ultimately agreed to do so. *Id.* ¶ 170. "To ensure that student-athletes received the grades they needed to maintain eligibility, Nyang'oro graded the papers generously, regardless of paper quality." *Id.*

Plaintiffs allege that UNC student-athletes "accounted for a disproportionately high percentage of enrollments" in the sham classes, but they do not allege that the

3

courses were taken exclusively by student-athletes. *Id.* ¶ 161. Similarly, while Plaintiffs allege that "[t]he grades awarded to student-athletes in these AFAM paper classes were significantly higher than the average grades they received in . . . academically sound AFAM classes," they do not allege that student-athletes received higher grades than non-student-athletes in the AFAM paper classes. *Id.* ¶ 162. McCants alleges that she enrolled in two of the allegedly unsound classes, *id.* ¶ 10, and Ramsay one, *id.* ¶ 13. Both McCants and Ramsay maintain that they were "not informed and did not know" that their work in those classes "was not supervised or graded by a faculty member" or that the classes were otherwise "academically unsound." *Id.* ¶¶ 11, 14.

**B.    Plaintiffs' Theory Of Liability And Allegations Against The NCAA**

The NCAA is an unincorporated, voluntary association of colleges, universities, and athletic conferences with more than 1,100 members, including Defendant UNC. *See id.* ¶¶ 15, 17, 25. Plaintiffs allege that through its constitution, bylaws, regulations, rules, and policies, the NCAA governs intercollegiate athletics at NCAA member institutions. *See id.* ¶ 16.

As Plaintiffs' own allegations demonstrate, the NCAA had no direct involvement in the alleged academic fraud at UNC. The crux of Plaintiffs' complaint is found in a lengthy discussion of the criticisms that have been levied at the NCAA since 1989, *see id.* ¶¶ 108-09, 111-16, 123-29, 138-44, and the ways in which Plaintiffs believe the rules the NCAA has adopted in response to such criticism have proved inadequate to prevent member institutions from engaging in academic fraud, *see id.* ¶¶ 110, 117-22, 130-37.

4

Much of this discussion implicates policy questions that, whatever their merits, ultimately have no bearing on the legal claims Plaintiffs bring in this case. Plaintiffs' primary complaint, as relevant here, is about what the NCAA does not, and has never purported, to do—"conduct[ ] any regular review of college courses taken or majors selected by or for student athletes, or require[ ] its member schools to submit course catalogues, lists and descriptions of courses taken by student-athletes, or descriptions of those courses," *id.* ¶ 122. In other words, Plaintiffs acknowledge that the NCAA has never regulated the content of college courses.

Plaintiffs nevertheless attempt to tie the NCAA to events at UNC by asserting that "the NCAA knew that academic fraud—of the sort occurring at UNC—was rampant among its members, yet it failed to develop, adopt, and implement adequate monitoring mechanisms to detect whether member schools were providing academically unsound classes to student-athletes—and stop any such occurrences." *Id.* ¶ 186. Plaintiffs further allege that the NCAA "failed to devote sufficient resources to enforce its rules prohibiting academic fraud," *id.* ¶ 188, and that "[t]he NCAA's failure in enforcement and monitoring . . . permitted UNC's academic fraud to persist for two decades," *id.* ¶ 194. Plaintiffs also criticize the NCAA's response to the allegations of academic fraud at UNC, saying that the NCAA initially "conducted only a cursory investigation and insisted that any scandal was academic and not athletic—despite the disproportionate enrollment of student-athletes in AFAM paper classes." *Id.* ¶ 195.

5

Seeking a theory to connect their policy-based criticisms to a legal cause of action against the NCAA, Plaintiffs assert that the NCAA has "held itself out as the guardian of college athletes' education and educational opportunities." *Id.* ¶ 48. For instance, Plaintiffs cite Article 2.2 of the NCAA Constitution, which prescribes that "[i]ntercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student-athletes." *Id.* ¶ 32. Plaintiffs also point to NCAA Constitution Article 2.12, which states that "[e]ligibility requirements shall be designed to assure proper emphasis on educational objectives . . . and to prevent exploitation of student-athletes." *Id.* ¶ 37. They also observe that the NCAA website proclaims that the NCAA's "belief in student-athletes as students first is a foundational principle." *Id.* ¶ 43. Such statements, Plaintiffs claim, show that "the NCAA has expressly and implicitly assumed certain duties to the student-athletes it has vowed to protect." *Id.* ¶ 48.

Plaintiffs also assert that, "through its eligibility requirements," the NCAA "controls the academic and athletic life and conduct of prospective college athletes" from a young age. *Id.* ¶ 49; *see id.* ¶¶ 53, 54. For example, while Plaintiffs recognize that "NCAA member schools ultimately provide the education," they claim that the NCAA's Eligibility Center is "the 'front porch' of college athletics and education," *id.* ¶ 55, on the theory that prospective student-athletes who wish to compete for an NCAA member school must satisfy the NCAA's eligibility requirements to do so, *see id.* On that basis, Plaintiffs assert that "future student-athletes and their parents place their trust and

6

confidence in the NCAA as the chief protector of educational welfare for student-athletes" and "[t]his special confidence persists throughout the student-athlete's collegiate experience, and results in considerable superiority and influence accorded to, and wielded by, the NCAA." *Id.* ¶ 56.

Plaintiffs' complaint also describes a series of prior instances of academic fraud at NCAA member institutions, *id.* ¶¶ 58-87, which they say demonstrate that the NCAA was aware of the risk of such fraud, *see id.* ¶ 57. For example, Plaintiffs note that "[f]rom 1993 to 1998, faculty and staff at the University of Minnesota were found to have completed take-home exams and completed nearly 400 pieces of course work for at least 18 athletes in order to keep them eligible." *Id.* ¶ 72. The NCAA "learned of this activity during the Class Period and issued a public report condemning the school." *Id.* Plaintiffs' complaint details other examples of academic fraud uncovered and publicly reported—by the media, and often by the NCAA itself—during the Class Period. *Id.* ¶¶ 61, 72, 76, 79, 80, 84, 87.

Plaintiffs also posit that the NCAA was aware that "[t]he enormous time demands on athletes . . . create an environment that effectively encourages academic fraud," which they maintain, should likewise have made clear "the need for an aggressive monitoring and prevention program." *Id.* ¶ 88. Plaintiffs assert that despite its awareness of the time-pressures facing student-athletes, "the NCAA failed to enforce" its rules limiting time spent on athletics or "take adequate steps to detect and prevent the academic fraud the NCAA had incentivized." *Id.* ¶ 107.

## C.    Plaintiffs' Claims Against The NCAA

Based on the above allegations, Plaintiffs assert causes of action for negligence and breach of fiduciary duty against the NCAA.[1]  *Id.* ¶¶ 234-48.  As to their negligence claim, Plaintiffs allege that the NCAA "voluntarily assumed a duty," *id.* ¶ 235, "to institute, supervise, regulate, monitor, and provide adequate mechanisms to safeguard the education and educational opportunities of student-athletes at NCAA member schools— and to detect and prevent the provision of academically unsound courses to student-athletes," *id.* ¶ 236.  The NCAA, Plaintiffs contend, "acted carelessly and negligently in its position as the regulatory body supervising the academic integrity of college athletics programs and governing its student-athletes," and "knew or should have known that its actions or inaction with respect to academic integrity at member schools would cause harm to Plaintiffs."  *Id.* ¶ 237.  Plaintiffs also maintain that the NCAA "has voluntarily assumed a fiduciary duty . . . to protect the education and educational opportunities of student-athletes," including "an obligation to institute, supervise, regulate, monitor, and provide adequate mechanisms to safeguard the education and educational opportunities of student-athletes."  *Id.* ¶ 244.  Plaintiffs allege that the NCAA breached that duty by failing to detect and prevent academic fraud at UNC.  *See id.* ¶ 247.  In essence, as to both counts pled against the NCAA, Plaintiffs' claim is based on the idea that the NCAA had a legal duty to ensure that UNC would uphold the requirements of an implied contract that UNC is alleged to have entered with Plaintiffs, and would not breach the

---

[1] Plaintiffs bring causes of action for breach of implied contract and breach of the implied covenant of good faith and fair dealing against UNC.  Compl. ¶¶ 249-59.

implied covenant of good faith and fair dealing allegedly included in that implied contract.

In addition, Plaintiffs' complaint asserts that "[t]he applicable statutes of limitations have been tolled by UNC's false representations regarding the AFAM paper classes, and by its fraudulent concealment of material facts regarding the academically unsound nature of those classes." *Id.* ¶ 200. Specifically, Plaintiffs allege that UNC knew the courses at issue were academically unsound, and "[h]aving made representations about the nature, content, and integrity" of those classes, "had a duty to disclose" that they were unsound, but did not do so. *Id.* ¶ 209. As to the NCAA, Plaintiffs claim only that the NCAA did not "divulge information it obtained about" the classes "during the Class Period," *id.*, though Plaintiffs do not specify what information they believe that was. Plaintiffs do not allege that the NCAA concealed any information about the provisions of its constitution, bylaws, or other communications that form the purported basis for their claims against the NCAA.

Plaintiffs seek damages and declaratory and injunctive relief, "including the formation of an independent commission to review, audit, assess, and report on academic integrity in NCAA-member athletic programs and certify member-school curricula as providing comparable educations and educational opportunities to athletes and non-athletes alike." *Id.* at 99. Plaintiffs purport to represent a damages class of all former UNC scholarship student-athletes who enrolled in any of the allegedly fraudulent courses

from 1989 to 2011, *id.* ¶¶ 222, 225, and a broader declaratory and injunctive relief class

of all past and current UNC scholarship student-athletes, *id.* ¶ 224.

## III.
## QUESTIONS PRESENTED

1.  Whether the NCAA owed Plaintiffs a duty under traditional negligence standards to prevent academic fraud at UNC.

2.  Whether the NCAA owed Plaintiffs a fiduciary duty to prevent academic fraud at UNC.

3.  Whether Plaintiffs have standing to pursue injunctive relief.

4.  Whether the injunctive relief Plaintiffs seek in their complaint is broader than necessary to remedy the alleged harms they assert.

5.  Whether Plaintiffs' claims against the NCAA are barred by the applicable statutes of limitations.

## IV.
## ARGUMENT

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a

complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard . . .

asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[T]he

complaint's factual allegations must produce an inference of liability strong enough to

nudge the plaintiff's claims 'across the line from conceivable to plausible.'" *Nemet*

*Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256 (4th Cir. 2009) (quoting

*Iqbal*, 556 U.S. at 683).

Although a court considering a 12(b)(6) motion must accept all well-pled facts as true and draw all reasonable inferences in the plaintiffs' favor, *Adcock v. Freightliner LLC*, 550 F.3d 369, 374 (4th Cir. 2008), the court is not "bound by the legal conclusions drawn in the complaint," *id.*, nor must it accept as true plaintiffs' "unwarranted inferences, unreasonable conclusions[,] or arguments," *Nemet Chevrolet*, 591 F.3d at 255 (quotation omitted). Additionally, when a plaintiff lacks standing, dismissal under Federal Rule of Civil Procedure 12(b)(1) is appropriate. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).

## A. The NCAA Did Not Owe Plaintiffs A Duty To Prevent Academic Fraud At UNC

Both of the causes of action asserted against the NCAA depend on the existence of a duty owed by the NCAA to Plaintiffs to prevent academic fraud at UNC. Whether couched as a duty owing under traditional negligence or fiduciary standards, the result is the same: no duty exists, and Plaintiffs' claims against the NCAA should be dismissed.

### 1. The NCAA Did Not Owe Plaintiffs A Duty Under Traditional Negligence Standards

Plaintiffs do not allege that the NCAA has any direct relationship with student-athletes in connection with the substance of the education they receive. Nor do they allege that the NCAA controls its member schools' curricula. *Cf. Cureton v. NCAA*, 198 F.3d 107, 117 (3d Cir. 1999) (observing, in the Title VI context, that "the NCAA does not 'control' its members"). Instead, Plaintiffs' theory is that the NCAA was negligent in regulating its member institutions, and had a duty to do more. *See* Compl. ¶¶ 236-37.

11

But North Carolina courts have rejected precisely this theory, and "[i]n the absence of a legal duty owed to the plaintiff by [the defendant], [the defendant] cannot be liable for negligence." *Stein v. Asheville City Bd. of Educ.*, 626 S.E.2d 263, 267 (N.C. 2006) (quotation omitted) (alterations in original); *see Davidson v. Univ. of N.C. at Chapel Hill*, 543 S.E.2d 920, 926 (N.C. Ct. App. 2001) ("Actionable negligence presupposes the existence of a legal relationship between parties by which the injured party is owed a duty by the other, and such duty must be imposed by law.").

Mere regulation, certification, or oversight does not create liability for the voluntary, affirmative actions of individuals or entities. In *Foster v. National Christian Counselors Association, Inc.*, No. 1:03CV00296, 2004 WL 1497562 (M.D.N.C. June 1, 2004), the court applied that rule to claims from plaintiffs alleging that the defendant—a nonprofit offering instruction in Christian counseling, which issued certificates to individuals who completed its course of study and met various other requirements— failed to properly train, supervise, and control an individual who abused his position as a counselor to harm the plaintiffs. *Id.* at *1. Among other things, the plaintiffs asserted that the defendant "had a duty to protect them" from the counselor's actions because the defendant "oversaw" him "through a Code of Ethics" and "had authority to discipline [the counselor] for violations of" that Code. *Id.* at *3. The court rejected those arguments, explaining that "regulating an activity is not the same as engaging in it, or even controlling it, under North Carolina law." *Id.* at *4. Regulation therefore "is not enough to subject a party to liability for the actions of those being regulated." *Id.* at *4

12

n.5. "[S]etting rules governing an activity" does not create "day-to-day control" over those to whom those rules apply, *id.* at *4, and it is such day-to-day control that gives rise to a duty to protect others from harm by third parties under North Carolina law, *see id.*; *see also id.* at *2.

"Were the law otherwise," the *Foster* court reasoned, "professional organizations and government entities would be endlessly liable for the actions of their members or the persons they seek to regulate." *Id.* at *4 n.5. "[T]his would mean that bar, medical, and other regulated associations would be liable for all actions taken by [their] members," which "would discourage entities from engaging in regulatory activity, a result that would not be in the public interest." *Id.* Like the NCAA, organizations such as bar and medical associations voluntarily formulate guidelines for their members' conduct. But, as *Foster* points out, it would be absurd to suggest that a state bar association exposes itself to tort liability every time a lawyer harms a client through unethical practices merely because the bar association says it is committed to the ethical practice of law and provides and enforces a code of ethics for attorneys. Likewise, no one would reasonably think the American Medical Association is liable when a physician commits medical malpractice, despite the AMA's Code of Medical Ethics. So, too, the NCAA is not, by virtue of the fact that it supplies and enforces rules and guidelines for various aspects of intercollegiate athletics, subject to liability for the independent actions of its member institutions—like UNC—over which the NCAA does not have "direct, day-to-day, operational control," *id.* at *4.

13

*Mynhardt v. Elon University*, 725 S.E.2d 632 (N.C. Ct. App. 2012), confirms *Foster*'s analysis. In *Mynhardt*, the plaintiff—a student who was seriously injured in a confrontation at an off-campus fraternity party—alleged that the university and fraternity owed him a duty of care based on a voluntary undertaking theory. *Id.* at 635. The plaintiff alleged that the defendants "knew of the specific dangers involved with open fraternity parties, and they undertook to regulate said activities" to protect students. *Id.* The court rejected the plaintiff's theory, holding that the university had assumed no duty to the plaintiff through its adoption of policies to curb student drinking at off-campus activities and could not be liable for negligence. *Id.* at 636-37. The court reached this conclusion even though the university "exercise[d] control over certain aspects of 'Greek' life on campus" and had "promulgated rules and regulations affecting Greek organizations." *Id.* at 634. Citing *Hall v. Toreros, II, Inc.*, 626 S.E.2d 861, 866-67 (N.C. Ct. App. 2006), the court explained that it had "rejected [the] argument that the adoption of regulations for the purpose of protecting a class of people constitutes a voluntary undertaking that creates a duty to that class of people that would not otherwise exist." *Mynhardt*, 725 S.E.2d at 636. Although the court "want[ed] to encourage universities and Greek organizations to adopt policies to curb underage drinking and drinking-related injuries or other incidents," it recognized that "[a]dopting such policies . . . does not make a university or Greek organization an insurer of every student, member, or guest who might participate in off-campus activities." *Id.* at 636-37. The *Mynhardt* court also held that there was no "special relationship" between the university and the plaintiff—a

14

student—that would otherwise obligate the university to protect him from harm by third parties. *Id.*; *see id.* at 637 ("[T]he student-university relationship, standing alone, does not constitute a special relationship giving rise to a duty of care." (quoting *Davidson*, 543 S.E.2d at 928)).

Both *Mynhardt* and *Foster* are directly on point here, and they compel the conclusion that the NCAA did not assume a duty to ensure the quality of the education student-athletes received at member institutions or to protect student-athletes from the independent, voluntary acts of those institutions or their employees. Far from a novel idea, this body of North Carolina case law is a logical application of the basic tort-law principle that there generally "is no duty to prevent harm to another by the conduct of a third person." *Fussell v. NC Farm Bureau*, 680 S.E.2d 229, 233 (N.C. Ct. App. 2009) (quoting *Hendrick v. Rains*, 466 S.E.2d 281, 283 (N.C. Ct. App. 1996)); *see Foster*, 2004 WL 1497562, at *2; Restatement (Second) of Torts § 315 (1965). Plaintiffs' theory of liability as to the NCAA is all the more strained because their allegations fail to state a claim for breach of implied contract or of the covenant of good faith and fair dealing against UNC. *See* Def. UNC's Mem. Of Law In Support Of Mot. to Dismiss, Part III. Plaintiffs thus effectively allege that the NCAA breached a duty to protect them not only from conduct that the NCAA did not and could not control, but from conduct that is not actionable even against the entity that allegedly engaged in it.

Representations made by the NCAA in its constitution, by-laws, and other public statements—cited by Plaintiffs to show that "[t]he NCAA has long held itself out as the

15

guardian of college athletes' education and educational opportunities" and thereby "expressly and implicitly assumed certain duties to student-athletes it has vowed to protect," Compl. ¶ 48—do not change the above analysis or separately create a legal duty to Plaintiffs, because they do not demonstrate an "inten[t] to create direct legal obligations" between the NCAA and Plaintiffs. *Hairston v. Pac-10 Conf.*, 101 F.3d 1315, 1320 (9th Cir. 1996). In *Hairston*, a group of University of Washington football players alleged that the Pac-10 athletic conference's constitution, bylaws, and articles created a contract between the Pac-10 and its members, of which the plaintiffs were third-party beneficiaries. *Id.* In support of their claim, the plaintiffs pointed to the Pac-10 Constitution, which stated that the Pac-10 aimed "to enrich and balance the athletic and educational experiences of student-athletes at its member institutions, [and] to enhance athletic and academic integrity among its members." *Id.* (alteration in original). The "ultimate goal of the conference is realization of certain values including: '[a]cademic and athletic achievement of student-athletes,' 'increased educational opportunities for young people,' 'quality competitive opportunities for student-athletes,' and 'amateurism in intercollegiate athletics.'" *Id.* The Ninth Circuit affirmed dismissal of the plaintiffs' contract claim, because the court found the Pac-10's "vague, hortatory pronouncements" insufficient to support the contention that the Pac-10 intended to assume a direct obligation to every player on a Pac-10 team. *Id.* (quoting *Hairston v. Pac-10 Conf.*, 893 F. Supp. 1485, 1494 (W.D. Wash. 1994)).[2]

---

[2] *See also Knelman v. Middlebury College*, 898 F. Supp. 2d 697, 709 (D. Vt. 2012)

16

The statements Plaintiffs cite to show that the NCAA assumed a duty to them are similarly general and vague, and as in *Hairston*, Plaintiffs' claim that the statements created a legal obligation to them fails as a matter of law.

### 2. The NCAA Did Not Owe Plaintiffs A Fiduciary Duty

Plaintiffs' breach of fiduciary duty claim is subject to dismissal for the same basic reason as their negligence claim—Plaintiffs have not plausibly alleged the existence of a fiduciary relationship with the NCAA and cannot show that the NCAA owed them a fiduciary duty. *See Dalton v. Camp*, 548 S.E.2d 704, 707 (N.C. 2001).

A fiduciary relationship is "one in which 'there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence . . . , [and] it extends to any possible case . . . in which there is confidence reposed on one side, and *resulting domination and influence on the other*.'" *Id.* at 707-08 (quoting *Abbitt v. Gregory*, 160 S.E.2d 896, 906 (N.C. 1931)); *see S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 659 S.E.2d 442, 451-52 (N.C. Ct. App. 2008). The North Carolina Supreme Court recognizes as "fiduciary relationships" those between spouses, attorney and client, trustee and beneficiary, and partners in a partnership. *Dallaire v. Bank of Am., N.A.*, 760 S.E.2d 263,

_____

("Language in a college handbook or other official statement that is merely aspirational in nature, or that articulates a general statement of a school's 'ideals,' 'goals,' or 'mission,' is not enforceable."), *aff'd*, 570 F. App'x 66 (2d Cir. 2014); *Hall v. NCAA*, 985 F. Supp. 782, 796-97 (N.D. Ill. 1997) ("There can be no doubt that an important function of the NCAA and its constitution, bylaws, and regulations is to benefit student athletes. It is not clear, however, that this fact is sufficient to elevate a student from an incidental to an intended beneficiary.").

266-67 (N.C. 2014). "Common to all these relationships is a heightened level of trust and the duty of the fiduciary to act in the best interests of the other party." *Id.* at 266. By contrast, parties who interact at arms-length typically do not have a fiduciary relationship. *Crumley & Assocs., P.C. v. Charles Peed & Assocs., P.A.*, 730 S.E.2d 763, 767 (N.C. App. 2012).

It is well-established in North Carolina and elsewhere that universities do not ordinarily have a fiduciary relationship with their students. *McFadyen v. Duke Univ.*, 786 F. Supp. 2d 887, 986-87 (M.D.N.C. 2011) ("the student-administrator relationship is not generally a fiduciary relationship"), *aff'd in part & rev'd in part on other grounds*, 703 F.3d 636 (4th Cir. 2012); *Ryan v. Univ. of N.C. Hosps.*, No. COA04-16, 2005 N.C. App. LEXIS 402, at *10-12 (2005) (no fiduciary relationship "between educators/supervisors and medical residents"); *see Knelman*, 898 F. Supp. 2d at 717; *Hendricks v. Clemson Univ.*, 578 S.E.2d 711, 715-16 (S.C. 2003); *Shapiro v. Butterfield*, 921 S.W.2d 649, 651 (Mo. Ct. App. 1996). As one court has explained, there is no "fiduciary relationship between a school and one of its students," because "schools and school officials owe duties to all students, and fiduciary relationships typically involve a special relationship between the parties which requires the fiduciary to exalt the interests of his or her dependent over the competing interests of others, and to act exclusively on the dependent's behalf." *Knelman*, 898 F. Supp. 2d at 718; *accord Ryan*, 2005 N.C. App. LEXIS at *10. As a result, "[s]uch a relationship would immediately prove unworkable in the school context." *Knelman*, 898 F. Supp. 2d at 718.

18

Under this precedent, even UNC itself has no fiduciary duty to Plaintiffs. The NCAA, in turn, is far more removed from students' day-to-day academic experience than are educational institutions like UNC. Indeed, Plaintiffs' complaint nowhere suggests that the NCAA has *any* direct relationship with student-athletes in the academic realm, let alone the type of close relationship that rises to a fiduciary level. And the logic underlying courts' refusal to recognize the university-student relationship as a fiduciary one applies no less to the NCAA. Under Plaintiffs' theory, the NCAA would owe a fiduciary duty to each and every scholarship student-athlete at its member institutions. Like the students at any given university, however, those student-athletes will often have competing interests that would make it impossible for the NCAA simultaneously to act for the exclusive benefit of each of them, as a fiduciary must. Imposing broad fiduciary obligations on the NCAA accordingly would be just as "unworkable" as it is for universities and other schools.

In sum, the NCAA's regulation of intercollegiate athletics did not create any legal duty—fiduciary or otherwise—to ensure the academic integrity of the courses offered to student-athletes at its member institutions. Plaintiffs' claims fail as a matter of law. Moreover, because there is no set of facts under which the NCAA could owe a duty to ensure the quality of Plaintiffs' educational experience at UNC, their claims against the NCAA should be dismissed with prejudice.

**B.**     **Plaintiffs' Request For Injunctive Relief Should Be Dismissed**

In addition to the foregoing reasons why Plaintiffs' claims against the NCAA should be dismissed in their entirety, Plaintiffs' claim for injunctive relief should be dismissed on two separate grounds. First, Plaintiffs' allegations are insufficient to establish standing to pursue injunctive relief, and their request for injunctive relief is subject to dismissal under Federal Rule of Civil Procedure 12(b)(1). Second, the injunctive relief identified in the complaint is overbroad and therefore subject to dismissal on the allegations pled.

### 1.     Plaintiffs Do Not Have Standing To Pursue Injunctive Relief

The "irreducible constitutional minimum of standing contains three elements": 1) injury-in-fact; 2) traceability; and 3) redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).[3] "[A] plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env. Servs.*, 528 U.S. 167, 185 (2000). In order to establish standing to pursue injunctive relief, a plaintiff must be able to show that he or she is likely to suffer future injury. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (An injunction is "unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again."). "[P]ast exposure to illegal

---

[3] North Carolina courts apply similar principles to evaluate a plaintiff's standing to pursue the relief sought. *See Neuse River Found., Inc. v. Smithfield Foods, Inc.*, 574 S.E.2d 48, 51-54 (N.C. Ct. App. 2002); *see also Morgan v. Nash County*, 735 S.E.2d 615, 619-20 (N.C. Ct. App. 2012), *petition for discretionary review denied*, 738 S.E.2d 379 (N.C. 2013).

conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Id.* at 102 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)).

Plaintiffs have not made, and cannot make, the necessary showing here. McCants attended UNC from 2005 to 2009; Ramsay from 2007 to 2012. Compl. ¶¶ 9, 12. They are no longer collegiate student-athletes, nor is there any allegation that they have remaining NCAA eligibility. Courts have routinely found that plaintiffs who have graduated no longer have standing to pursue injunctive relief regarding practices that apply only to students, because they will not be subject to those policies in the future and do not stand to benefit from the injunction. *E.g.*, *Grandson v. Univ. of Minn.*, 272 F.3d 568, 574 (8th Cir. 2001) ("That a plaintiff lacks eligibility or is no longer a student is an adequate basis to dismiss an individual Title IX claim for injunctive relief."); *Cole v. Oroville Union High Sch.*, 228 F.3d 1092, 1098 (9th Cir. 2000) ("It is well-settled that once a student graduates, he no longer has a live case or controversy justifying declaratory and injunctive relief against a school's action or policy."); *cf. Pederson v. La. State Univ.*, 213 F.3d 858, 874 (5th Cir. 2000) ("As is so often the case in suits for injunctive relief brought by students, graduation or impending graduation renders [the plaintiffs'] claims for injunctive relief moot."). That straight-forward principle applies here.

Plaintiffs' role as putative class representatives cannot create standing where it otherwise does not exist. As the Fourth Circuit explained, "it is essential that named

21

class representatives demonstrate standing through a 'requisite case or controversy between *themselves personally* and [defendants],' not merely allege that 'injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 188 (4th Cir. 1993) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1001 n.13 (1982)) (alteration in original) (emphasis added).  And, for the reasons explained, Plaintiffs here cannot do so.

### 2. The Injunctive Relief Plaintiffs Seek Is Overbroad

Even if Plaintiffs' request for injunctive relief were not defeated by their inability to establish standing, Plaintiffs still would not be entitled to the injunction they seek, because it is far broader than the injuries they allege in their complaint.

Plaintiffs ask the Court to order injunctive relief including "the formation of an independent commission to review, audit, assess, and report on academic integrity in NCAA-member athletic programs and certify member-school curricula as providing comparable educations and educational opportunities to athletes and non-athletes alike." Compl. at 99.  The Fourth Circuit has cautioned against the imposition of such sweeping permanent injunctions:  "Being equitable relief, an injunction should be no broader than necessary to achieve its desired goals." *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 766 (4th Cir. 1998), *vacated on other grounds*, 527 U.S. 1031 (1999); *see PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 128 (4th Cir. 2011) ("It is well established that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." (quotation omitted)).  Accordingly, an

22

injection is inappropriate—and an abuse of discretion that will be vacated—"if it is broader in scope than that necessary to provide complete relief to the plaintiff or . . . does not carefully address only the circumstances of the case." *PBM Prods.*, 639 F.3d at 128 (quotation omitted).

Applying that principle, in *Virginia Society for Human Life, Inc. v. Federal Election Commission*, 263 F.3d 379 (4th Cir. 2001), the Fourth Circuit held that the district court abused its discretion by entering a nationwide injunction preventing the FEC from enforcing the challenged regulation against any party anywhere in the country, because the case involved a single plaintiff and "an injunction covering [that plaintiff] alone" would have "adequately protected" the plaintiff. *Id.* at 393. Similarly, in *Kentuckians for Commonwealth Inc. v. Rivenburgh*, 317 F.3d 425 (4th Cir. 2003), the court held that an injunction covering a district spanning five states was "far broader than necessary" to provide the plaintiff with relief, because the plaintiff operated entirely within Kentucky and its members alleged injury only in connection with a single site. *Id.* at 436. The injunctive relief Plaintiffs request in this case likewise reaches well beyond the scope of their alleged injuries. Plaintiffs seek relief that would extend to *all* NCAA member institutions, *see* Compl. at 99, but their allegations are tied solely to events at UNC, and the injunctive-relief class they seek to represent consists only of current and former UNC student-athletes, *id.* ¶ 224. Nothing in Plaintiffs' complaint suggests that the wide-ranging injunction they seek is necessary to provide them with relief.

23

Instead, Plaintiffs effectively ask the Court not just to remedy the particular harms they allege, but to dictate broad policy changes to the NCAA. That is not the proper function of injunctive relief, nor even more broadly of the court system. *Cf. E.E.O.C. v. Bloomberg L.P.*, 778 F. Supp. 2d 458, 485 (S.D.N.Y. 2011) ("[I]t is not the Court's role to engage in policy debates or choose the outcome it thinks is best. It is to apply the law."); *Doe v. U.S. Dep't of Health & Human Servs.*, No. CV 14-367, 2015 WL 1316290, at *1 (D.D.C. Mar. 24, 2015) (while the "plaintiff invite[d] judicial involvement" in the debate about sexual misconduct at universities, courts are empowered to resolve only cases or controversies involving "legally cognizable claims"). Plaintiffs' request for injunctive relief should be dismissed.

## C.    <u>Plaintiffs' Claims Against The NCAA Are Time-Barred</u>

Plaintiffs' claims against the NCAA are also subject to dismissal on the independent ground that they are barred by their respective statutes of limitations.

### 1.    Negligence

Under North Carolina law, negligence claims are subject to a three-year statute of limitations. N.C. Gen. Stat. § 1-52(5). A cause of action for negligence accrues when the wrong giving rise to the right to bring suit is committed, even if the injury cannot be discovered until a later date. *Hetzel v. JPMorgan Chase Bank, N.A.*, No. 4:13-CV-236, 2014 WL 7336863, at *3 (E.D.N.C. Dec. 22, 2014); *see Pearson v. Gardner Wynne Sewell LLP*, 814 F. Supp. 2d 592, 603 (M.D.N.C. 2011) (North Carolina statute of limitations for negligence not tied to discovery).

Plaintiffs' negligence claim is accordingly time-barred, because the "wrong giving rise to" that claim could have occurred no later than 2011. Plaintiffs allege that McCants enrolled in academically unsound courses at UNC in Spring 2006 and Spring 2008, Compl. ¶ 10, and Ramsay in Fall 2007, *id.* ¶ 13—all well more than three years before they filed their complaint on January 22, 2015. Even Plaintiffs' broader putative class allegations fall entirely outside the three-year limitations period—the asserted Class Period runs from 1989 to 2011. *Id.* ¶¶ 58, 226. It is during that period that Plaintiffs allege that "UNC furnished academically unsound classes that provided deficient educational instruction to thousands of students," *id.* ¶ 145, and that "the NCAA knew that academic fraud—of the sort occurring at UNC—was rampant among its members, yet failed to develop, adopt, and implement adequate monitoring mechanisms to detect whether member schools were providing academically unsound classes to student-athletes," *id.* ¶ 186. And Plaintiffs do not allege that the academic fraud on which their claims are based persisted after 2011.

Recognizing that their claims are otherwise time-barred, Plaintiffs contend that the limitations period was tolled by UNC's fraudulent concealment. *Id.* ¶ 200. Under North Carolina law, "fraudulent concealment can toll the statute of limitations where [a] plaintiff can show 'that the opposing party knew a material fact, and failed to fully disclose that fact in violation of a pre-existing duty to disclose.'" *Wilkerson v. Christian*, No. 1:06CV00871, 2008 WL 483445, at *11 (M.D.N.C. Feb. 19, 2008) (quoting *Friedland v. Gales*, 509 S.E.2d 793, 796-97 (N.C. Ct. App. 1998)). A fraudulent-

25

concealment claim is thus based on a duty to communicate on the part of the party remaining silent, such as that which exists where there is "a relationship of trust and confidence" between the parties. *Setzer v. Old Republic Life Ins. Co.*, 126 S.E.2d 135, 137 (N.C. 1962)

Plaintiffs' allegations of fraudulent concealment cannot save their claims against the NCAA from dismissal. To start, none of the facts Plaintiffs set forth regarding the alleged fraudulent concealment involve representations made by *the NCAA*. Instead, Plaintiffs specifically allege that the "applicable statutes of limitations have been tolled by *UNC's* false representations" and "fraudulent concealment of material facts." Compl. ¶ 200 (emphasis added). Plaintiffs offer no basis for imputing UNC's statements to the NCAA for tolling purposes; indeed, Plaintiffs' fraudulent concealment allegations barely mention the NCAA at all.

All that Plaintiffs say regarding the NCAA is that it did not "divulge information it obtained about UNC's AFAM paper classes during the Class Period." *Id.* ¶ 209.[4] But while Plaintiffs allege that UNC made various affirmative representations about the fraudulent classes during the Class Period that created a "duty to disclose" that they were actually academically unsound, *id.* ¶¶ 201-05, 209, Plaintiffs do not point to *any* comparable statement by the NCAA representing that the UNC courses at issue were legitimate. Absent such an affirmative representation regarding the classes in question,

---

[4] Notably, Plaintiffs' complaint does not specify what information they believe the NCAA had about those classes during the Class Period, or when the NCAA allegedly obtained that information.

26

Plaintiffs cannot show that the NCAA had a duty to speak as, for the reasons explained above, *see supra* Part IV.A.2, Plaintiffs have not plausibly alleged the existence of a special "relationship of trust and confidence," *Setzer*, 126 S.E.2d at 137, between Plaintiffs and the NCAA—the only other ground on which such a duty to speak could be found.

What is more, Plaintiffs' broader allegations confirm that the NCAA did not conceal the actions that Plaintiffs allege to be regulatory failures on its part. First, Plaintiffs acknowledge that many instances of academic fraud at NCAA member institutions were publicly known throughout the Class Period. *See* Compl. ¶¶ 57-87. Indeed, Plaintiffs allege that such information was in many cases made public *by the NCAA*. *Id.* ¶¶ 61, 72, 76, 79, 80. Second, Plaintiffs' complaint recognizes that the NCAA implemented policies aimed at addressing academic problems affecting student-athletes at multiple points during the Class Period. *See id.* ¶¶ 117-19, 121-22, 130-31, 133-34. While Plaintiffs view these measures as inadequate and ineffective, *id.* ¶¶ 110, 117-22, 130-37, the very fact that they were put in place—and publicly so—further undercuts any suggestion that the NCAA concealed the existence of academic fraud or other academic performance issues affecting collegiate student-athletes during the Class Period. Third, it was no secret that the NCAA did not review the substance of college courses. The NCAA's rules are publicly available, and as Plaintiffs point out, the NCAA's bylaws were openly criticized throughout the Class Period, *id.* ¶¶ 111-16, 123-

27

27, 136, 138-44. In fact, Plaintiffs allege that *the NCAA* itself issued a report reflecting "extensive criticism of its model" in 2002. *Id.* ¶ 129.

Finally, even if UNC's statements could somehow be imputed to the NCAA, Plaintiffs' theory of fraudulent concealment would still prove inadequate to toll the limitations period. Plaintiffs allege that UNC offered classes in which students "never had a single interaction with a faculty member," *id.* ¶ 149, and "no class attendance" was required, *id.* ¶ 152. They say that the classes "required little to no work," *id.* ¶ 4, and that student-athletes' grades in these classes were "significantly higher" than they received in other classes, *id.* ¶ 162. Plaintiffs were *enrolled* in these allegedly unsound classes. *See id.* ¶¶ 10, 13. Assuming their allegations about the classes are true, Plaintiffs necessarily knew that they never attended the "lecture" courses, did "little to no work" for them, and "never had a single interaction with a faculty member." They presumably were also aware of the grades they received. McCants alleges that she took two of the allegedly fraudulent courses; Ramsay alleges that he took one. *Id.* ¶¶ 9, 12. The classes at issue in this case thus constituted only a small fraction of the dozens of classes Plaintiffs took at UNC, and Plaintiffs could readily recognize the ways in which the allegedly deficient courses differed from the norm. UNC's alleged misrepresentations could not, as a practical matter, have concealed the relevant facts from Plaintiffs once Plaintiffs enrolled in the allegedly unsound classes.

It may be the case, as Plaintiffs assert, that they did not appreciate the full scope of the academic fraud taking place at UNC until the Wainstein Report was issued in October

2014. *See id.* ¶ 218.  But Plaintiffs did not need that information in order to bring their claims.  Plaintiffs allege that they not only experienced the academic fraud first-hand, but also suffered injury as a result—a contention that necessarily depends on the allegedly fraudulent classes being in some way materially (and thus noticeably) different from others offered at UNC.  Plaintiffs' asserted reliance on UNC's representations regarding the legitimacy of the academically unsound classes, *see id.* ¶ 205-07, was patently unreasonable given what they experienced once enrolled in those classes.  *See Wilkerson*, 2008 WL 483445, at *12 (requiring reliance on defendant's misrepresentations or omissions to warrant tolling of statute of limitations due to fraudulent concealment); *Stunzi v. Medlin Motors, Inc.*, 714 S.E.2d 770, 777 (N.C. Ct. App. 2011) ("[W]here the facts are insufficient as a matter of law to constitute reasonable reliance on the part of the complaining party, the complaint is properly dismissed under Rule 12(b)(6)." (quotation omitted)).

### 2. Breach Of Fiduciary Duty

Plaintiffs' breach of fiduciary duty claim is time-barred for the same reasons as their negligence claim.  The statute of limitations for claims alleging a fiduciary breach under North Carolina law is three years.  *Trillium Ridge Condo. Ass'n v. Trillium Links & Vill., LLC*, 764 S.E.2d 203, 219 (N.C. Ct. App. 2014); *Toomer v. Branch Banking & Trust Co.*, 614 S.E.2d 328, 334-35 (N.C. Ct. App. 2005).  The limitations period begins to run when the claimant "knew or, by due diligence, should have known" of the facts

constituting the basis for the claim.  *Dawn v. Dawn*, 470 S.E.2d 341, 343 (N.C. Ct. App. 1996).

For the reasons explained above, despite Plaintiffs' contentions that they "did not know that [their] work in the classes . . . was not supervised or graded by a faculty member or that the classes . . . were academically unsound," Compl. ¶¶ 11, 14, and did not appreciate the scope of the academic fraud until the Wainstein Report was issued, *id.* ¶ 218, Plaintiffs' own allegations demonstrate that they at the very least *should have known* that UNC offered academically unsound courses—and, under their theory, that the NCAA had accordingly failed to prevent UNC from doing so—long before that point, when they took the classes in question and claim to have been injured.

## CONCLUSION

For the foregoing reasons, Plaintiffs' claims against the NCAA should be dismissed with prejudice.

30

Dated:  March 30, 2015

Respectfully submitted,

/s/Justin N. Outling

Walter Dellinger
Stephen D. Brody
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
(202) 383-5300 Telephone
(202) 383-5414 Facsimile

*Of Counsel to Defendant The National
Collegiate Athletic Association*

James T. Williams, Jr. (NC Bar No. 4758)
Henry E. Frye (NC Bar No. 1556)
Jennifer K. Van Zant (NC Bar No. 21280)
Justin N. Outling (NC Bar No. 38409)
BROOKS, PIERCE, MCLENDON,
    HUMPHREY & LEONARD LLP
2000 Renaissance Plaza
230 N. Elm Street
Greensboro, NC 27401
(336) 373-8850 Telephone
(336) 378-1001 Facsimile

*Attorneys for Defendant The National
Collegiate Athletic Association*

31

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing was filed with the Clerk of Court using the CM/ECF system and was served upon the following by email or by depositing a copy in the United States Mail, first-class postage prepaid, addressed to the following:

Robert F. Orr, Esq.
3434 Edwards Mill Road, Suite 112-372
Raleigh, NC  27612
orr@rforrlaw.com

Michael D. Hausfeld
Sathya Gosselin
Swathi Bojedla
Hausfeld LLP
1700 K Street, NW, Suite 650
Washington, DC  20006
mhausfeld@hausfeld.com
sgosselin@hausfeld.com
sbojedla@hausfeld.com

Jeannine M. Kenney
Hausfeld LLP
325 Chestnut St., Suite 900
Philadelphia, PA  19106
jkenney@hausfeld.com

Charles J. Ogletree, Jr.
516 Hauser Hall
1575 Massachusetts Avenue
Cambridge, MA  02138
ogletree@law.harvard.edu

*Attorneys for Plaintiffs*

Patrick Fitzgerald
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
155 North Wacker Drive
Chicago, IL 60606

Lisa Gilford
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
300 South Grand Avenue
Suite 3400
Los Angeles, CA 90071

Stephanie A. Brennan
N.C. Department of Justice
POB 629
Raleigh, NC 27602

*Attorneys for Defendant
the University of North Carolina
at Chapel Hill*

This the 30th day of March, 2015.

/s/ Justin Outling
Justin N. Outling