IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| RASHANDA MCCANTS and DEVON RAMSAY, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:15-cv-176 |
| THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION and THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

LORETTA C. BIGGS, District Judge.

Plaintiffs, Rashanda McCants ("McCants") and Devon Ramsay ("Ramsay"), brought this putative class action in state court against the National Collegiate Athletic Association (the "NCAA") and the University of North Carolina at Chapel Hill ("UNC-Chapel Hill"), alleging various state claims against each Defendant. The NCAA removed the case to this Court. Following removal, UNC-Chapel Hill and the NCAA moved to dismiss the claims against them for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, among other grounds. (ECF Nos. 19, 20.) The Court heard oral argument in this matter, and for the reasons that follow, the Court grants the NCAA's motion to dismiss.[1]

---

[1] A separate order was simultaneously entered with this Memorandum Opinion and Order with respect to UNC-Chapel Hill's motion to dismiss and the other pending motions in this case.

Plaintiffs assert claims of negligence and breach of fiduciary duty against the NCAA. Specifically, Plaintiffs allege in their Complaint that from 1989 to 2011, UNC-Chapel Hill enrolled a number of students in independent studies classes in the African and Afro-American Studies Department ("AFAM"), which involved no instruction, no faculty supervision, and required no class attendance. (ECF No. 5 ¶¶ 4, 145, 147.) These classes were managed by an AFAM administrator who registered students for the class, assigned paper topics, and administered grades. (*Id.* ¶¶ 149–50.) Thousands of students enrolled in these classes, a majority of whom were part of the general student population, and student-athletes accounted for a disproportionately high percentage of enrollments. (*Id.* ¶¶ 145, 161.) UNC-Chapel Hill officials steered student-athletes to these "academically unsound classes"[2] to maintain their eligibility to play sports. (*Id.* ¶¶ 154, 163.)

McCants and Ramsay were among the students who enrolled in these AFAM classes. McCants attended UNC-Chapel Hill from 2005 to 2009 on an athletic scholarship and played on the women's basketball team. (*Id.* ¶ 9.) Ramsay was also on an athletic scholarship, attending UNC-Chapel Hill from 2007 to 2012, where he played on the football team. (*Id.* ¶ 12.) While at UNC-Chapel Hill, McCants enrolled in two of the AFAM classes, one in the spring of 2006 and the other in the spring of 2008. (*Id.* ¶ 10.) Ramsay took one of these classes in the fall of 2007. (*Id.* ¶ 13.) McCants graduated from UNC-Chapel Hill in 2009 with

---

[2] Both the NCAA and Plaintiffs characterize the AFAM classes as "academically unsound." However, in their discussion, both parties use the terminology "academically unsound" and "academically sound" in discussing their contentions. While the Court posits no opinion as to the quality of these classes or any other classes offered by UNC-Chapel Hill, it will reference the terms as characterized by the parties in discussing their contentions.

a degree in Communications and Media Productions, and Ramsay graduated from UNC-Chapel Hill in 2012 with a degree in Public Policy. (*Id.* ¶¶ 9, 12.)

The NCAA moves to dismiss Plaintiffs' claims of negligence and breach of fiduciary duty for failure to state a claim of relief pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[3] (ECF No. 21 at 1.)

## I.     LEGAL STANDARD

The purpose of a motion made under Rule 12(b)(6) of the Federal Rules of Civil Procedure "is to test the sufficiency of a complaint." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A complaint may fail to state a claim upon which relief can be granted in two ways: first, by failing to state a valid legal cause of action, *i.e.*, a cognizable claim, *see Holloway v. Pagan River Dockside Seafood, Inc.*, 669 F.3d 448, 452 (4th Cir. 2012); or second, by failing to allege sufficient facts to support a legal cause of action, *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although a plaintiff need only plead a short and plain statement of the claim establishing that he or she is entitled to relief, this standard "demands more than an

---

[3] In addition, the NCAA moves to dismiss Plaintiffs' claims as barred by North Carolina's three-year statute of limitations, also pursuant to Rule 12(b)(6). (ECF No. 21 at 24.) Furthermore, the NCAA seeks dismissal of Plaintiffs' request for injunctive relief on two grounds: first, that Plaintiffs' request for injunctive relief should be dismissed under Rule 12(b)(1) for lack of standing; and second, that the requested relief is overbroad. (*Id.* at 20.) Because the Court dismisses Plaintiffs' negligence and breach of fiduciary duty claims against the NCAA based on Plaintiffs' failure to state a claim of relief, the Court need not address these remaining arguments.

unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 677–78 (quoting *Twombly*, 550 U.S. at 555). Nor is the court required to accept "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. The factual allegations "must be enough to raise a right to relief above the speculative level." *Id.* In other words, a claim is plausible when the complaint alleges facts that allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Further, where, as in this case, subject matter jurisdiction is based on diversity of citizenship, the court must apply the substantive law of the forum state. *See Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002). In doing so, the court has an obligation to apply the law as determined by the state's highest court, *i.e.*, the North Carolina Supreme Court. *See id.* When the state's highest court has not addressed directly or indirectly the issue before the federal court, the state's appellate courts' decisions, though not binding, constitute the best indicia of what the state law is unless the court is convinced by other persuasive data that the state's highest court would rule otherwise. *Id.* The court must apply state laws as they currently exist and cannot expand them. *Burris Chem., Inc. v. USX Corp.*, 10 F.3d 243, 247 (4th Cir. 1993); *Myers v. Sessoms & Rogers, P.A.*, 781 F. Supp. 2d 264, 269 (E.D.N.C. 2011) ("Federal courts applying state laws should not create or expand a state's common law or public policy.").

## II. NEGLIGENCE

Plaintiffs, in support of their negligence claim against the NCAA, assert that "[t]he NCAA has voluntarily assumed a duty to protect the education and educational opportunities

of student-athletes (including the provision of academically sound courses) participating in NCAA-sponsored athletic programs at NCAA member institutions." (ECF No. 5 ¶ 235.) Specifically, they claim "the NCAA had a duty of reasonable care to Plaintiffs . . . to institute, supervise, regulate, monitor, and provide adequate mechanisms to safeguard the education and educational opportunities of student-athletes at NCAA member schools—and to detect and prevent the provision of academically unsound courses to student-athletes." (*Id.* ¶ 236; *see id.* ¶ 48.) The NCAA denies that it has assumed such a duty and argues that Plaintiffs' Complaint fails to allege facts which demonstrate a plausible claim for relief against the NCAA. (ECF No. 21 at 1, 11.) The Court agrees with the NCAA.

"Actionable negligence presupposes the existence of a legal relationship between parties by which the injured party is owed a duty by the other, and such duty must be imposed by law." *Pinnix v. Toomey*, 87 S.E.2d 893, 897 (N.C. 1955). A legal duty is an obligation that requires an individual "to conform to a certain standard of conduct, for the protection of others against unreasonable risks." *Oberlin Capital, L.P. v. Slavin*, 554 S.E.2d 840, 846 (N.C. Ct. App. 2001) (quoting *Davis v. N.C. Dep't of Human Res.*, 465 S.E.2d 2, 6 (N.C. Ct. App. 1995)). "In the absence of a legal duty owed to the plaintiff by [the defendant], [the defendant] cannot be liable for negligence." *Stein v. Asheville City Bd. of Educ.*, 626 S.E.2d 263, 267 (N.C. 2006) (alterations in original) (quoting *Cassell v. Collins*, 472 S.E.2d 770, 772 (N.C. 1996), *abrogated on other grounds by Nelson v. Freeland*, 507 S.E.2d 882 (N.C. 1998)). Whether a legal duty exists is a

matter of law for the court to decide.[4]  *Steele v. City of Durham*, 782 S.E.2d 331, 334 (N.C. Ct. App. 2016).

North Carolina courts have consistently recognized a common law rule that "imposes on every person engaged in the prosecution of any undertaking [a duty] to use due care, or to so govern his actions as not to endanger the person or property of others." *Pinnix*, 87 S.E.2d at 897; *see Toone v. Adams*, 137 S.E.2d 132, 136 (N.C. 1964).  The North Carolina Supreme Court has explained that a duty frequently arises out of a contractual relationship, "the theory being that accompanying every contract is a common-law duty to perform with ordinary care the thing agreed to be done." *Pinnix*, 87 S.E.2d at 898.  The duty sued on in a negligence action, however, "is not the contractual promise but the duty to use reasonable care in affirmatively performing that promise." *Oates v. Jag, Inc.*, 333 S.E.2d 222, 225 (N.C. 1985) (quoting *Navajo Circle, Inc. v. Dev. Concepts Corp.*, 373 So. 2d 689, 691 (Fla. Dist. Ct. App. 1979)).

This common law duty may also arise when a person, although under no obligation to do so, "voluntarily undertakes to provide needed services" to another.[5]  *Lampkin v. Hous. Mgmt. Res., Inc.*, 725 S.E.2d 432, 438 (N.C. Ct. App.), *rev. denied*, 731 S.E.2d 147 (N.C. 2012).  Such an

---

[4] When the facts are in dispute, they are submitted to the jury for resolution; however, whether those facts give rise to a legal duty remains an issue of law for the court.  *Mozingo v. Pitt Cty. Mem'l Hosp., Inc.*, 400 S.E.2d 747, 753 (N.C. Ct. App. 1991), *aff'd*, 415 S.E.2d 341 (N.C. 1992).  At this stage of the litigation in this case, the Court is to take the facts as alleged in Plaintiffs' Complaint as true in determining whether Plaintiffs have sufficiently alleged the existence of a legal duty owed to them by the NCAA that is recognized under North Carolina law.  However, the Court does not accept as true legal conclusions.

[5] *See, e.g., Isenhour v. Hutto*, 517 S.E.2d 121, 126 (N.C. 1999) ("The City, by providing school crossing guards, has undertaken an affirmative, but limited, duty to protect certain children, at certain times, in certain places."); *Hawkins v. Houser*, 371 S.E.2d 297, 299 (N.C. Ct. App. 1988) ("Defendants, though volunteers in telephoning for aid, had the positive duty to use ordinary care in performing that task . . . .").

undertaking has been identified by the North Carolina courts as the "voluntary undertaking" doctrine or the "assumption of duty" theory.[6] *Id.* Under this doctrine, there must be "some showing of an act or acts by the defendant indicating that the defendant actually engaged in some undertaking." *Id.*; *see Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1103 (9th Cir. 2009) (explaining that "one does not merely undertake; one undertakes *to do* something"). In such cases, a party's duty and potential liability are limited to the extent of that party's undertaking—that is, to the specific services provided by that party to another. *See Dawkins ex rel. Estate of Dawkins v. United States*, 226 F. Supp. 2d 750, 759 (M.D.N.C. 2002) (citing *Cassell*, 472 S.E.2d at 772–73); *see also Lanni v. Nat'l Collegiate Athletic Ass'n*, 42 N.E.3d 542, 550 (Ind. Ct. App. 2015) ("[T]o impose liability resulting from breach of assumed duty, it is essential to identify and focus on the specific services undertaken.").

Ultimately, the common law imposes a duty of reasonable care on any individual acting on any undertaking, regardless of whether the source of that undertaking was a contract or that individual's voluntary acts. *See Huyck Corp. v. C.C. Mangum, Inc.*, 309 S.E.2d 183, 187 (N.C. 1983) ("Regardless of its source, a duty to act subjects a party to liability for the failure to use due care in acting upon that duty."); *see also Asheville Contracting Co. v. City of Wilson*, 303 S.E.2d 365, 373 (N.C. Ct. App. 1983). "At its most basic level, liability for negligence is premised on

---

[6] North Carolina courts have not always clearly identified the voluntary undertaking doctrine as such in their decisions. *See Davidson v. Univ. of N.C. at Chapel Hill*, 543 S.E.2d 920, 929 (N.C. Ct. App. 2001) (explaining that "[t]he voluntary undertaking theory has been consistently recognized in North Carolina, although it is not always designated as such").

the fact that a party is performing a particular undertaking in a negligent fashion." *Daniels v. Reel*, 515 S.E.2d 22, 27 (N.C. Ct. App.), *rev. denied*, 537 S.E.2d 818 (1999).

As earlier referenced, Plaintiffs have premised their negligence claim on the voluntary undertaking doctrine or assumption of duty theory. The Court must therefore determine whether Plaintiffs' Complaint contains sufficient allegations to support their claim that the NCAA engaged in a voluntary undertaking such that North Carolina law would impose a duty upon the NCAA to use reasonable care in carrying out that undertaking.

Plaintiffs' Complaint spans 100 pages and contains 259 paragraphs. Many of these paragraphs contain broad, sweeping assertions that are neither specific to the NCAA nor specific to the plaintiffs in this case. While these paragraphs provide interesting background and policy prescriptions, perhaps intended for public consumption, they do little to support Plaintiffs' assertion that the NCAA voluntarily assumed a duty of care to them. In considering the NCAA's motion to dismiss Plaintiffs' putative class action Complaint, the Court can only consider allegations related to the named plaintiffs—McCants and Ramsay—and not generalized allegations concerning unnamed plaintiffs or putative class members. *See Crissen v. Gupta*, 994 F. Supp. 2d 937, 945–46 (S.D. Ind. 2014). Moreover, the Court cannot consider generalized allegations to determine whether the named plaintiffs alleged sufficient facts to state a claim upon which relief can be granted. *Id.* The Court thus at oral argument asked Plaintiffs' counsel to state the specific facts that they contend demonstrate a voluntary undertaking by the NCAA to Plaintiffs. (ECF No. 41 at 62:23–63:1.) Plaintiffs' counsel failed to address the Court's inquiry and responded:

> The entire system would not exist. There would be no recruitment of young men and women as athletes for college institutions other than what might exist on a compartmentalized individual basis school by school . . . . They have put themselves in the position of being the supplier of athletes to the entire university system that comprises their membership, which is virtually all Division I schools . . . .

(*Id.* at 63:2–9.) Such generalized, sweeping assertions are not sufficient as a matter of law to show that the NCAA undertook any *specific, affirmative tasks* that would amount to a voluntary undertaking recognized by North Carolina law. *See Mayall v. USA Water Polo, Inc.*, --- F. Supp. 3d ----, 2016 WL 1254034, at *6 (C.D. Cal. Mar. 30, 2016) (rejecting the plaintiff's purported voluntary undertaking theory that was based on "sweeping allegations" as insufficient to show that the defendant undertook any specific task). To the extent that Plaintiffs raise policy rather than legal issues for the Court to determine, Plaintiffs have chosen the wrong forum.

A careful reading of the Complaint indicates that Plaintiffs appear to rely on a limited number of paragraphs to support their claim of voluntary undertaking.[7] In paragraph 2 of their Complaint, Plaintiffs allege that "[t]he NCAA . . . has made a firm promise and commitment to college athletes—that it will protect the education and educational opportunities of men and women participating in college athletics" and further that it "has held itself out as the principle guardian of college athletes' academic welfare." (ECF No. 5 ¶ 2.) According to the Complaint, "[t]his commitment courses throughout the NCAA's governing documents, its publicly stated mission, its State of the Association addresses, its

---

[7] *See Horn v. Lee*, No. 7:07-cv-00546, 2008 WL 345888, at *1 (W.D. Va. Feb. 7, 2008) (explaining that it is not the court's obligation to "pore through" a complaint in search of a claim).

Constitution and Bylaws, and numerous other representations to the public, to parents of athletes, and to minors at the very early stages of their athletic careers."[8] (*Id.*) In paragraph 4 of the Complaint, Plaintiffs allege that "[t]he NCAA . . . broke these promises . . . in spectacular fashion." (*Id.* ¶ 4.) Further, in the section of the Complaint titled "The NCAA's Stated Mission to Safeguard the Education of College Athletes," Plaintiffs set forth examples of statements made in speeches by NCAA officials and contained in the NCAA's Constitution, in its Bylaws, and on its website. (*See id.* ¶¶ 29–30, 39–46.) Also in this section are various rules and procedures promulgated by the NCAA that concern academics, including its eligibility requirements for student-athletes. (*Id.* ¶¶ 31–38.) This section ends with paragraph 48, in which Plaintiffs allege, "As these numerous examples demonstrate, the NCAA has long *held itself out* as the guardian of college athletes' education and educational opportunities. As such, the NCAA has expressly and implicitly assumed certain duties to student-athletes it has vowed to protect." (*Id.* ¶ 48 (emphasis added).) Specifically, Plaintiffs contend these alleged voluntarily assumed duties include safeguarding "the provision of academically sound courses" offered at its member institutions. (*Id.* ¶ 235.)

Based on these statements and acts, Plaintiffs argue that their Complaint plausibly alleges that the NCAA has a duty of reasonable care in safeguarding the provision of "academically sound classes" at UNC-Chapel Hill. Thus, the Court will examine the following acts or statements on which Plaintiffs appear to rely as support for their argument: (1) the

---

[8] Plaintiffs' presentation at oral argument likewise focused on aspirational statements as well as rules and policies contained in the NCAA's governing documents, similar aspirational statements on its website, speeches by NCAA officials, statements of NCAA officials in other civil actions, and reports from third-party organizations.

NCAA, through public representations made by NCAA officials and through statements in its Constitution, in its Bylaws, and on its website, has held itself out as promising to safeguard the educational opportunities of student-athletes; and further, that the NCAA "broke" these promises (*id.* ¶¶ 4, 29–30, 39–46); and (2) the NCAA has promulgated policies, regulations, and procedures to safeguard the education of student athletes (*id.* ¶¶ 31–38).

1. *NCAA's Public Statements, Constitution, Bylaws, and Website*

The Complaint alleges that the NCAA has held itself out as safeguarding the educational opportunities of student-athletes, citing numerous public statements made by NCAA officials in speeches, as well as statements contained in provisions of the NCAA's Constitution, Bylaws, and website. (*See, e.g., id.* ¶¶ 29–30, 39–46.) Examples cited include: "The [NCAA] was founded on the notion of integrating athletics into the educational experience, and we have to make sure we deliver on that 100-year-old promise" (*id.* ¶ 40); "[T]he NCAA's mission is 'first and foremost . . . to promote student-athlete success in the classroom and on the field . . .'" (*id.* ¶ 44); "There is nothing more important . . . than educational opportunities for student[]-athletes]" (*id.* ¶ 45); "[T]he 'basic purpose of [the NCAA] is to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body'" (*id.* ¶ 30); and "[T]he NCAA is committed to 'academics and student-athlete success in the classroom [, which] is a vital part of the NCAA's mission to integrate athletics into higher education'" (*id.* ¶ 42) (second alteration in original).

Plaintiffs, however, have provided no North Carolina court decisions that would support their claim that public statements espousing aspirational goals, statements of generic

intent, or statements vowing or acknowledging that it has a duty, such as those outlined in their Complaint, constitute promises that would create a legal duty based on a voluntary undertaking. Nor is this Court aware of any such decisions. In fact, courts in other jurisdictions have declined to find a voluntary undertaking and a corresponding legal duty based on such statements.[9] Even if such statements could be interpreted as promises, as the Ninth Circuit observed, "[t]o undertake a thing, within the meaning of the tort, *is* to do it. Promising is different because it is not synonymous with the performance of the action promised." *Barnes*, 570 F.3d at 1107. Thus, Plaintiffs' allegation that the NCAA made promises that it has now "broken" cannot form the basis of their claim of negligence based

---

[9] *See, e.g.*, *Mayall*, 2016 WL 1254034, at *6 ("Plaintiff bases Defendant's purported voluntary undertaking on vague, sweeping allegations like 'USA Water Polo has undertaken broad responsibility in setting and enforcing the rules of water polo,' and '[Defendant has asserted] that it would provide a healthy and safe environment' to players. Those actions and statements don't support that Defendant undertook any *specific* task to prevent or care for head injuries." (alteration in original)); *In re Welding Fume Prods. Liab. Litig.*, 526 F. Supp. 2d 775, 799 (N.D. Ohio 2007) (observing that a committee's statement that it had a duty to "ensure a safe working environment for welders and associated personnel" was "aspirational in nature" and without more, "not tantamount to shouldering a duty to an individual plaintiff"); *Ky. Laborers Dist. Council Health & Welfare Tr. Fund v. Hill & Knowlton, Inc.*, 24 F. Supp. 2d 755, 774 (W.D. Ky. 1998) (explaining that the defendants "may have made vaguely promissory statements to the general public" but such "[p]recatory statements and generic expressions of intent . . . do not create legal duties"); *Texas v. Am. Tobacco Co.*, 14 F. Supp. 2d 956, 973 (E.D. Tex. 1997) (explaining that Texas law does not recognize corporate statements or advertising as sufficient to create a duty based on the voluntary undertaking theory); *Doe 30's Mother v. Bradley*, 58 A.3d 429, 455 (Del. Super. Ct. 2012) ("[A] statement of aspirational goals that an organization's members will strive to uphold does not meet the prerequisites for even the most minimal of the recognized undertakings—a mere promise. Many volunteer organizations provide a statement of aspirational goals to their members, none of which are understood as undertakings to provide specific services to specific persons that would subject the organization to liability.").

on a voluntary undertaking. It is well settled under North Carolina law that breach of a promise does not give rise to a suit in tort for negligence.[10]

Nevertheless, Plaintiffs argue that a voluntary undertaking can "arise . . . from a gratuitous promise, unenforceable in contract."[11] The origin of this language can be traced to the Second Restatement of Torts, §§ 323 & 324A.[12] However, the North Carolina Supreme Court has emphasized that the Second Restatement of Torts is not the law of North Carolina, though it may be persuasive in certain contexts.[13] *Cassell*, 472 S.E.2d at 772 ("We reemphasize yet again that the Restatement of Torts is *not* North Carolina law."); *see Dawkins*, 226 F. Supp. 2d at 755–56 (refusing to recognize a duty under § 324A of the Second Restatement of Torts, explaining that "[i]t is unlikely that the North Carolina Supreme Court would impose on a defendant any tort duty based on the Second Restatement of Torts"). In addition, a review of North Carolina court decisions confirms that imposition of an actionable duty of care based

---

[10] *See LaBarre v. Duke Univ.*, 393 S.E.2d 321, 324 (N.C. Ct. App.) ("North Carolina does not provide a remedy in tort where a promisor negligently fails to keep a contractual promise . . . ."), *rev. denied*, 399 S.E.2d 122 (N.C. 1990); *N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co.*, 232 S.E.2d 846, 851 (N.C. Ct. App. 1977) (explaining that failure to begin performance is generally not a tort), *aff'd*, 240 S.E.2d 345, 351 (N.C. 1978) ("[O]ur research has brought to our attention no case in which this Court has held a tort action lies against a promisor for his simple failure to perform his contract . . . .").

[11] (ECF No. 24 at 15 (emphasis omitted) (quoting David A. Logan & Wayne A. Logan, North Carolina Torts § 2.20 (1996)). This language was also quoted in *Davidson*. 543 S.E.2d at 929.

[12] *See* Logan & Logan, supra, § 2.20 n.12 (citing Restatement (Second) of Torts § 323); *see also* Restatement (Second) of Torts § 324A.

[13] It is important to note that in the caveat to the Second Restatement of Torts, §§ 323 & 324A, the American Law Institute "expresses no opinion as to whether . . . the making of a contract, or a gratuitous promise, without in any way entering upon performance, is a sufficient undertaking to result in liability" under these sections. §§ 323 & 324A.

on *any* undertaking, irrespective of its source, requires affirmative conduct by the alleged

tortfeasor.[14]

Further, even if, for the sake of argument, the Court found that Plaintiffs' Complaint

sufficiently alleged a voluntary undertaking, their negligence claim would still fail. North

Carolina courts finding negligent performance of a duty assumed have done so only in cases

involving *physical injury* or *property damage,*[15] neither of which are alleged in this case. Plaintiffs'

---

[14] *See, e.g., Isenhour*, 517 S.E.2d at 123, 126 (reciting the plaintiff's allegation that an automobile struck and killed her son after the school crossing guard directed him to cross, and holding that "[t]he City, by providing school crossing guards, ha[d] undertaken an affirmative, but limited, duty to protect certain children, at certain times, in certain places"); *Firemen's Mut. Ins. Co. v. High Point Sprinkler Co.*, 146 S.E.2d 53, 56–59, 61–62 (N.C. 1966) (holding, in a case where a pipe burst in a warehouse and caused property damage, that the professional fire sprinkler company that had contracted to inspect the warehouse and prepared specifications for the warehouse's fire sprinkler system had a "duty to use due care" in the performance of its work); *Davidson*, 543 S.E.2d at 922, 929 (holding, in a case involving an injured cheerleader, that UNC-Chapel Hill voluntarily undertook to advise and educate cheerleaders about safety when it acknowledged as such and its officials engaged in conduct that implicitly established that UNC-Chapel Hill had assumed such duties); *Prince v. Wright*, 541 S.E.2d 191, 196 (N.C. Ct. App. 2000) (explaining that the plaintiff's allegations were sufficient to show an undertaking where the defendant had performed an inspection for damage or potential damage to an electrical system four days prior to a fire that killed one child and injured another); *Jacobsen v. McMillan*, 476 S.E.2d 368, 370 (N.C. Ct. App. 1996) (holding, in a case alleging personal injuries when a minor jumped from the bed of the defendant's truck, that "by offering [the minor] a ride, [the defendant] voluntarily assumed the duty to exercise due care in delivering [the minor] safely to his grandparent's home); *Ferguson v. Williams*, 374 S.E.2d 438, 438, 440 (N.C. Ct. App. 1988) (explaining that, in an action for wrongful death due to an allergic reaction to prescribed medication, once a pharmacist undertakes to advise a customer, the pharmacist has a duty to advise correctly); *Hawkins*, 371 S.E.2d at 299 (explaining that in an action for wrongful death, the "[d]efendants, though volunteers in telephoning for aid, had the positive duty to use ordinary care in performing that task" when they allegedly delayed the rescue of the victims from a lake by misdirecting the rescue squad); *Klassette v. Mecklenburg Cty. Area Mental Health, Mental Retardation & Substance Abuse Auth.*, 364 S.E.2d 179, 181, 184 (N.C. Ct. App. 1988) (holding that an employee of a treatment center for drug and alcohol abuse assumed a duty of care to the plaintiff by his affirmative conduct, which included locking the plaintiff in the car and regularly monitoring his vital signs when the plaintiff sustained a permanent brain injury due to oxygen deprivation); *see also Lumsden v. United States*, 555 F. Supp. 2d 580, 582, 589 (E.D.N.C. 2008) (explaining that "[t]he Complaint . . . sufficiently alleges that the Government, by and through its agents, failed to exercise ordinary care and skill in undertaking a course of conduct," specifically, the "agents' act(s) of making the canister of ether available . . . by delivering it to [the Marine Corps private] in his vehicle together with his car keys" where he subsequently became intoxicated and slammed the vehicle he was driving into plaintiffs' vehicle, killing one plaintiff and severely injuring others).

[15] *See supra* n.14 (citing cases).

alleged injuries in this case are purely economic.[16]  *See McFadyen v. Duke Univ.*, 786 F. Supp. 2d 887, 998 (M.D.N.C. 2011) (holding that North Carolina would not recognize a claim of negligence based on the voluntary undertaking doctrine where the injury is economic in nature), *aff'd in part, rev'd in part on other grounds, dismissed in part sub nom. Evans v. Chalmers*, 703 F.3d 636 (4th Cir. 2012).

Accordingly, this Court concludes that public statements by NCAA officials, as well as general, gratuitous statements contained in NCAA governing documents and on its website, as outlined in Plaintiffs' Complaint, are insufficient as a matter of law to support imposition of a legal duty upon the NCAA premised on the voluntary undertaking doctrine under North Carolina law.[17]

---

[16] Similarly, "the substantial majority of courts" applying the Restatement's formulation of the voluntary undertaking doctrine have held that the voluntary undertaking doctrine "does not permit recovery when only economic harm is alleged." *Rocha v. Brown & Gould, LLP*, 101 F. Supp. 3d 52, 87 n.30 (D.D.C. 2015) (listing cases); *see, e.g., AIG Specialty Ins. Co v. Phoenician LLC*, No. 2:13-2578 WBS CKD, 2014 WL 4795193, *6 (E.D. Cal. Sept. 24, 2014) (explaining that courts in a large number of jurisdictions have observed that the references to "physical harm" in § 323 and § 324A of the Restatement preclude recovery for economic losses, while a small number of courts have concluded that pure economic losses are recoverable under those sections of the Restatement); *Waters v. Autuori*, 676 A.2d 357, 363 (Conn. 1996) (concluding that an organization that promulgated professional accounting standards could not be liable under the voluntary undertaking doctrine because the Restatement § 324A limited liability to claims involving personal injury or property damage); *see also Hendricks v. Clemson Univ.*, 578 S.E.2d 711, 715 (S.C. 2003) (noting that the line of cases discussing the voluntary undertaking doctrine involved physical harm and not economic injury).

[17] The Court has found only two circumstances in which North Carolina courts appear to recognize a promise as sufficient to support an undertaking under North Carolina law.  The first line of cases deals with promises by an insurance agent to procure an insurance policy for a potential insured.  *See, e.g., Alford v. Tudor Hall & Assocs., Inc.*, 330 S.E.2d 830, 832 (N.C. Ct. App.), *rev. denied*, 337 S.E.2d 855 (N.C. 1985).  The second line of cases deals with police promising to furnish protection to a specific individual.  *See, e.g., Braswell v. Braswell*, 410 S.E.2d 897, 902 (N.C. 1991).

### 2. *NCAA's Rules, Policies, and Procedures*

The Complaint further alleges as support for Plaintiffs' theory of a voluntary undertaking that the NCAA has promulgated rules, policies, and procedures contained in its Constitution and Bylaws that relate to safeguarding the educational opportunities of student-athletes.  Examples cited include:  "[T]he NCAA requires its member schools to '[p]rovide evidence that the well-being of student-athletes and the fairness of their treatment is monitored, evaluated and addressed on a continuing basis'" (ECF No. 5 ¶ 32) (second alteration in original); "NCAA Operating Bylaw 20.9.1.7 underscores the NCAA's written commitment to policing 'Sound Academic Standards' for student-athletes" and "[s]tandards of the [NCAA] . . . shall be designed to ensure proper emphasis on educational objectives and the opportunity for academic success"  (*id.* ¶ 34); "[T]he NCAA's Operating Bylaw 19 prohibits 'academic fraud' by [Division I] athletes or their schools and identifies that conduct as a breach of NCAA rules subject to the most severe penalties" (*id.* ¶ 35); and "[T]he NCAA implements and enforces eligibility requirements, including academic progress and graduation rate standards, which purportedly safeguard the education and educational opportunities promised to student-athletes.  NCAA member institutions must comply with these eligibility requirements in order to compete in NCAA-sanctioned events" (*id.* ¶ 36).

While rules and regulations promulgated by the NCAA may be relevant to the issue of breach of the standard of care, they are irrelevant to the threshold issue of whether a legal duty exists in the first instance.  *Hall v. Toreros, II, Inc.*, 626 S.E.2d 861, 866–877 (N.C. Ct. App. 2006), *aff'd per curiam*, 678 S.E.2d 656 (N.C. 2009).  It is well settled under North Carolina law that the adoption of rules, policies, and procedures, as alleged by Plaintiffs, is insufficient as a

matter of law to impose a legal duty based on the voluntary undertaking doctrine.[18]  As this

Court observed, "regulating an activity is not the same as engaging in it, or even controlling it,

under North Carolina law." *Foster v. Nat'l Christian Counselors Ass'n*, No. 1:03CV00296, 2004

WL 1497562, at *4 (M.D.N.C. June 1, 2004) (citing *Daniels*, 515 S.E.2d at 28–29); *see Daniels*,

515 S.E.2d at 26–27 (holding that national and state organizations that promulgated rules and

regulations for a baseball program were not liable for the baseball players' injuries where it was

the local post that "exercised exclusive, day-to-day control over the operation of their

respective teams").[19]  Plaintiffs have not sufficiently alleged conduct by the NCAA that goes

beyond regulation that demonstrates that the NCAA *engaged in specific tasks or provided specific*

---

[18] As the North Carolina Court of Appeals explained, "[t]o rule otherwise would serve only to discourage, indeed penalize, voluntary assumption or self-imposition of safety standards." *Hall*, 626 S.E.2d at 867; *see Phillips v. Sheetz, Inc.*, No. 5:11-cv-00090-RLV-DSC, 2013 WL 5567423, at *1 (W.D.N.C. Oct. 9, 2013) (holding that a company policy that provides for a harassment-free workplace for its employees is insufficient to create a duty owed from employer to employee); *Estate of Tipton ex rel. Tipton v. High Point Univ.*, 775 S.E.2d 694, 2015 WL 3793263, at *3 (N.C. Ct. App. June 16, 2015) (unpublished table decision) (recognizing that the adoption of safety regulations "does not constitute a voluntary undertaking that creates a duty to a class of people"); *Mynhardt v. Elon Univ.*, 725 S.E.2d 632, 635–37 (N.C. Ct. App. 2012) (declining to impose a legal duty on the university based on a voluntary undertaking, explaining that the court wanted to encourage the adoption of policies by universities to deal with drinking-related injuries or other incidents); *see also Lanni*, 42 N.E.2d at 553 (holding that the NCAA's regulations of the field of play and other rules and policies with respect to safety issues were insufficient to impose a duty on the NCAA to oversee or directly supervise the actions of member institutions and student-athletes).

[19] *See Richmond v. Indalex Inc.*, 308 F. Supp. 2d 648, 663–64 (M.D.N.C. 2004) (holding that allegations that a parent company promulgated safety procedures that its subsidiary was supposed to implement were insufficient to show it assumed a duty of care to the plaintiff, explaining that the plaintiff had failed to show that the parent company "entered upon an active course of conduct to ensure the safety of [the subsidiary's] employees so as to create an independent claim of negligence against [the parent company]"); *Edwards v. GE Lighting Sys., Inc.*, 685 S.E.2d 146, 150–51 (N.C. Ct. App. 2009) (holding that a parent company's adopting of a safety audit program for its subsidiary's plant failed to establish that the parent company assumed primary responsibility for workplace safety at the subsidiary's facility, concluding that day-to-day safety remained the exclusive responsibility of the subsidiary).

*services* to Plaintiffs to ensure the "academic soundness" of classes taken by them at UNC-Chapel Hill.

While Plaintiffs have alleged that the NCAA owed them a duty of reasonable care to, among other things, institute, supervise, monitor, and provide adequate mechanisms to ensure the "academic soundness" of classes at UNC-Chapel Hill, nowhere in the Complaint have Plaintiffs alleged that the NCAA actually engaged in these *specific tasks*. In fact, Plaintiffs' Complaint on its face alleges the contrary: "NCAA member schools ultimately provide the education" (ECF No. 5 ¶ 55); "[T]he NCAA does not and has never conducted any regular review of college courses taken or majors selected by or for student athletes, or required its member schools to submit course catalogues, lists and descriptions of courses taken by student-athletes, or descriptions of those courses" (*id.* ¶ 122); and "[T]he NCAA . . . relied on member-school self-monitoring and self-reporting of violations" (*id.* ¶ 189). These allegations in Plaintiffs' Complaint undermine or defeat any notion that the NCAA engaged in a course of conduct to ensure the "academic soundness" of classes at UNC-Chapel Hill. *See Richmond v. Indalex Inc.*, 308 F. Supp. 2d 648, 655, 663 (M.D.N.C. 2004). It would appear that what Plaintiffs really seek is for the NCAA to do more, *i.e.*, to undertake these tasks. *See James v. Duquesne Univ.*, 936 F. Supp. 2d 618, 644–45 (W.D. Pa. 2013) (holding that there is no duty to provide more benefits than what was voluntarily undertaken by the defendant). However, because the NCAA has not undertaken such tasks, no duty to do so is imposed under the voluntary undertaking doctrine. For this Court to find the allegations in Plaintiffs' Complaint sufficient to support such a duty, an expansion of North Carolina's existing laws involving the voluntary undertaking doctrine would be required, which the Court cannot and will not do.

Nor can Plaintiffs base their voluntary undertaking theory on the NCAA's alleged administration of its eligibility requirements to prospective and current student-athletes. The Complaint alleges, among other things, the following: "[T]he NCAA implements and enforces eligibility requirements, including academic progress and graduation rate standards, which purportedly safeguard the education and educational opportunities promised to student-athletes. NCAA member institutions must comply with these eligibility requirements in order to compete in NCAA-sanctioned events" (ECF No. 5 ¶ 36). Plaintiffs' argument that the NCAA's administration of its eligibility requirements constitutes an alleged undertaking is distinct from an undertaking to ensure the "academic soundness" of classes at UNC-Chapel Hill, as Plaintiffs contend in this case. *See Dawkins ex rel. Estate of Dawkins,* 226 F. Supp. 2d at 759 (explaining that "the extent of a party's duty and its corresponding extent of liability are limited by the scope of the party's undertaking" (citing *Cassell*, 472 S.E.2d at 772–73)).

Plaintiffs argue that the "[NCAA] [is] asking the Court to assume a critical fact, and that is that the NCAA is nothing more [than] . . . an oversight agency. . . . [W]e passionately disagree with that fact." (ECF No. 41 at 61:22–25.) This argument, however, misses the point. The issue is not whether the NCAA is or is not merely an oversight agency; the critical question here is whether Plaintiffs have sufficiently alleged that the NCAA engaged in a course of conduct that would amount to a voluntary undertaking under North Carolina law. Plaintiffs have failed to do so. The Court concludes that Plaintiffs' reliance on the NCAA's adoption of rules and regulations, including the administration of its eligibility requirements, fails as a matter of law to support Plaintiffs' claim that the NCAA assumed a duty to ensure the "academic soundness" of classes offered at UNC-Chapel Hill.

Because Plaintiffs have failed as a matter of law to allege a plausible claim of negligence based on the voluntary undertaking theory under North Carolina law, their negligence claim must be dismissed.

## III.  BREACH OF FIDUCIARY DUTY

As an alternative to their negligence claim, Plaintiffs assert a claim for breach of fiduciary duty.  They allege "[t]he NCAA has voluntarily assumed a fiduciary duty—which includes duties of loyalty, cooperation, honesty, good faith and fair dealing, and the exercise of due care—to protect the education and educational opportunities of student-athletes (including the provision of academically sound courses) participating in NCAA-sponsored athletic programs at NCAA member institutions."  (ECF No. 5 ¶ 244.)  The NCAA seeks dismissal of this claim, asserting that Plaintiffs have not plausibly alleged the existence of a fiduciary relationship or a fiduciary duty.  (ECF No. 21 at 17.)  The Court agrees.

Under North Carolina law, to state a claim for breach of a fiduciary duty, "a plaintiff must allege that a fiduciary relationship existed and that the fiduciary failed to 'act in good faith and with due regard to [plaintiff's] interests[.]'"  *McFadyen*, 786 F. Supp. 2d at 986 (alterations in original) (quoting *Toomer v. Branch Banking & Trust Co.*, 614 S.E.2d 328, 337 (N.C. Ct. App.), *rev. denied*, 623 S.E.2d 263 (N.C. 2005)).  As one court explained, "[a] fiduciary duty is distinct from a simple tort duty in the negligent context, and finding an assumed fiduciary duty requires more than a mere voluntary undertaking."  *Beaudoin v. Davidson Tr. Co.*, 263 P.3d 755, 760 (Idaho 2011).  For there to be a fiduciary duty, there must be a fiduciary relationship where "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one

20

reposing confidence, . . . [and] 'it extends to any possible case . . . in which there is confidence reposed on one side, and *resulting domination and influence on the other.*'" *Dalton v. Camp*, 548 S.E.2d 704, 707–08 (N.C. 2001) (alteration in original) (quoting *Abbitt v. Gregory*, 160 S.E. 896, 906 (N.C. 1931)). "Common to all [fiduciary] relationships is a heightened level of trust and the duty of the fiduciary to act in the best interests of the other party." *Dallaire v. Bank of Am., N.A.*, 760 S.E.2d 263, 266 (N.C. 2014).

Ordinarily, the existence or nonexistence of a fiduciary relationship depends on the circumstances presented in each case and is generally a determination for the finder of fact. *Stamm v. Salomon*, 551 S.E.2d 152, 158 (N.C. Ct. App. 2001), *rev. denied*, 560 S.E.2d 139 (N.C. 2002); *see HAJMM Co. v. House of Raeford Farms, Inc.*, 403 S.E.2d 483, 489 (N.C. 1991) ("Courts have historically declined to offer a rigid definition of a fiduciary relationship in order to allow imposition of fiduciary duties where justified."). However, as the North Carolina Supreme Court explained, characteristics of a fiduciary relationship are easily present between spouses, attorney and client, trustee and beneficiary, and partners to a partnership.[20] *Dallaire*, 760 S.E.2d at 266. In contrast, North Carolina courts have generally refused to recognize a fiduciary

---

[20] North Carolina courts have also found that a fiduciary duty existed in other circumstances. *See, e.g.*, *Cash v. State Farm Mut. Auto. Ins. Co.*, 528 S.E.2d 372, 381 (N.C. Ct. App.) (explaining that an insurance agent has a fiduciary duty to inform the insured correctly as to insurance coverage but has no duty with respect to settlement of claims), *aff'd per curiam*, 538 S.E.2d 569 (N.C. 2000); *Brown v. Roth*, 514 S.E.2d 294, 296 (N.C. Ct. App. 1999) (explaining that a real estate agent has a fiduciary duty to his principal to make full and truthful disclosure of all facts known to him and that the principal has a right to rely on such statements and disclosures); *Adams v. Moore*, 385 S.E.2d 799, 800–01 (N.C. Ct. App. 1989) (holding that preachers owed a fiduciary duty to their parishioner and violated that duty by using their position and influence to obtain the deed to the parishioner's home and then selling it a few months later for a profit), *rev. denied*, 389 S.E.2d 83 (N.C. 1990); *Lackey v. Bressler*, 358 S.E.2d 560, 564 (N.C. Ct. App. 1987) (recognizing a fiduciary relationship between doctor and patient); *Stilwell v. Walden*, 320 S.E.2d 329, 331 (N.C. Ct. App. 1984) (recognizing a fiduciary relationship between guardian and ward).

relationship between an employer and employee,[21] between businesses with equal bargaining positions negotiating at arm's length,[22] and between a corporation and shareholders or between the shareholders themselves.[23]

While a fiduciary relationship need not arise from legal relations but can arise in situations which are "moral, social, domestic or merely personal," *Frizzell Constr. Co. v. First Citizens Bank & Tr. Co.*, 759 F. Supp. 286, 290 (E.D.N.C. 1991) (quoting *Abbitt*, 160 S.E. at 906–07), North Carolina courts, like other jurisdictions, have generally declined to recognize a fiduciary relationship in the academic setting, such as between a university and its students. *Ryan v. Univ. of N.C. Hosps.*, 609 S.E.2d 498, 2005 WL 465554, at *4 (N.C. Ct. App. Mar. 1, 2005) (unpublished table decision); *see McFadyen*, 786 F. Supp. 2d at 986–87. As the court observed in *Ryan*, there are divided loyalties that exist in the academic setting, which "is unlike other fiduciary relationships in which the fiduciary must act primarily for the benefit of another." 2005 WL 465554, at *4; *see Knelman v. Middlebury Coll.*, 898 F. Supp. 2d 697, 718 (D. Vt. 2012) (explaining that "school officials owe duties to *all* students, and fiduciary relationships typically involve a special relationship between the parties which requires the fiduciary to exalt the interests of his or her dependent over the competing interests of others, and to act exclusively on the dependent's behalf").

---

[21] *See, e.g.*, *Dalton,* 548 S.E.2d at 708.

[22] *See, e.g.*, *Strickland v. Lawrence*, 627 S.E.2d 301, 306 (N.C. Ct. App.), *rev. denied*, 633 S.E.2d 472 (N.C. 2006).

[23] *See, e.g.*, T-*WOL Acquisition Co. v. ECDG South, LLC*, 725 S.E.2d 605, 617 (N.C. Ct. App. 2012).

Here, Plaintiffs have not provided, and this Court has not identified, any North Carolina court decision upon which this Court could base a conclusion that the NCAA and Plaintiffs occupy a fiduciary relationship out of which the NCAA owed them a fiduciary duty to ensure the "academic soundness" of classes at UNC-Chapel Hill. Further, the reasons identified by the court in *Ryan* and others in declining to recognize a fiduciary relationship in the academic setting are equally applicable in this case. The Complaint clearly alleges that the NCAA serves interests other than those of student-athletes, specifically the interests of its member institutions that empower it and ultimately provide the student-athletes with the education. (*See* ECF No. 5 ¶¶ 18, 55.) The existence of these divided loyalties precludes a fiduciary relationship between the NCAA and Plaintiffs under the circumstances of this case. *See Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 348 (4th Cir. 1998) (declining to impose fiduciary duties on a franchisor-franchisee relationship, explaining that a fiduciary "bears the extraordinary obligation" not to put his interests over the interests of those for whom he is obligated to act); *Knelman*, 898 F. Supp. 2d at 718 (explaining that a fiduciary relationship between a school and student "would immediately prove unworkable" because of divided loyalties (citing *McFadyen*, 786 F. Supp. 2d at 986–87)). While Plaintiffs are correct that North Carolina courts have intentionally defined a fiduciary relationship broadly, leaving the door open for a determination based on the particular circumstances of each case, a federal court sitting in diversity, as is this Court, cannot expand North Carolina law or policy "farther than any North Carolina court has been willing to go." *Broussard*, 155 F.3d at 348. Because North Carolina courts have been reluctant to extend the concept of fiduciary relationships to the academic setting, *see Ryan*, 2005 WL 465554, at *4, and without a clear signal that they are

23

willing to do so, the Court cannot expand North Carolina law by concluding that Plaintiffs' Complaint plausibly alleges a fiduciary relationship between the NCAA and Plaintiffs.[24] *See Broussard*, 155 F.3d at 349.

Nor do the allegations related to the NCAA's eligibility requirements in paragraphs 49 to 56 of the Complaint alter the Court's conclusion.[25] These allegations do not reference UNC-Chapel Hill, McCants, or Ramsay at all and certainly do not demonstrate that McCants or Ramsay reposed trust in the NCAA to ensure the "academic soundness" of classes at UNC-Chapel Hill. The breadth of these allegations would seem to suggest that Plaintiffs seek to impose a fiduciary duty on the NCAA to safeguard the "academic soundness" of classes to the "more than 170,000 college athletes [that] compete in [Division I] NCAA-sanctioned sports each year" (ECF No. 5 ¶ 20). *See Flood v. Nat'l Collegiate Athletic Ass'n*, No. 1:15-CV-890, 2015 WL 5785801, at *11 (M.D. Pa. Aug. 26, 2015) ("[W]hile the NCAA oversees some aspects of intercollegiate athletics it is not a fiduciary for the thousands of student athletes who participate in those sports, and may not be held to the legal standards of a fiduciary relationship."); *Knelman*, 898 F. Supp. 2d at 718 (declining to impose a fiduciary relationship where the fiduciary would be required to protect diverse needs and interests, creating possibly unlimited liability). Moreover, it does not follow that because the NCAA has established various eligibility requirements that relate to academic eligibility that the NCAA has voluntarily

---

[24] This is especially so in light of Plaintiffs' representations at oral argument that the Court should view UNC-Chapel Hill and the NCAA in the same manner. (*See* ECF No. 41 at 35:18–36:1, 36:23–37:5, 64:11–16.)

[25] As stated above, McCants and Ramsay, as the named plaintiffs for the putative class, must allege sufficient facts that they have a claim against the NCAA. *See Crissen*, 994 F. Supp. 2d at 946.

assumed a fiduciary duty to safeguard the "academic soundness" of classes at its member schools, including UNC-Chapel Hill. *See Rhône-Poulenc Agro S.A. v. Monsanto Co.*, 73 F. Supp. 2d 540, 548 (M.D.N.C. 1999) (recognizing that the scope of a fiduciary duty extends only to matters that are within the scope of the fiduciary relationship); *In re Sechrest*, 537 S.E.2d 511, 517 (N.C. Ct. App. 2000) (same), *rev. denied*, 547 S.E.2d 16 (N.C. 2001).

The Court concludes that Plaintiffs have failed as a matter of law to allege a plausible claim of breach of a fiduciary duty by the NCAA to Plaintiffs to ensure the "academic soundness" of classes at UNC-Chapel Hill. Plaintiffs' claim of breach of fiduciary duty therefore must be dismissed.

## IV. CONCLUSION

This Court recognizes that the public has a strong interest in the myriad of policy concerns surrounding the NCAA's role in intercollegiate athletics and in connection with the alleged academic improprieties that took place at UNC Chapel Hill; however, the scope of the Court's authority is limited to a determination of whether Plaintiffs have alleged a plausible claim for relief against the NCAA under North Carolina law. Plaintiffs have failed as a matter of law to state a plausible claim against the NCAA under Rule 12(b)(6) of the Federal Rules of Civil Procedure based on either negligence or breach of fiduciary duty. Thus, the NCAA's motion to dismiss based on failure to state a claim must be granted. The Court need not consider the NCAA's remaining arguments for dismissal.[26]

---

[26] *See supra* n.3.

For the reasons outlined herein, the Court enters the following:

**ORDER**

IT IS THEREFORE ORDERED that the NCAA's Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (ECF No. 20) is GRANTED. The NCAA is hereby DISMISSED from this action.

This, the 12th day of August, 2016.

____/s/ Loretta C. Biggs____<br>
United States District Judge